DAVID BLUMENFELD, Appellant, v. MEYER-SCHMID GROCER COMPANY and ROBERT C. ROLF, Defendants, ROBERT C. ROLF, Respondent.

**St. Louis Court of Appeals. Opinion Filed April 5, 1921.**

1. **MASTER AND SERVANT:** Acts of Servant's Delegate: Servant Without Authority and Not Co-operating: Master Not Liable. The master is not liable for the acts of a stranger, where his servant, without authority so to do, delegates a particular duty in its entirety to such stranger and is not present and does not in any manner cooperate with the latter in the performance thereof.

2. ——: Acts of Servant and Another: Acting in concert: Scope of Employment: Assault and Battery: Liability of Master: Case for the Jury. In an action for assault and battery to recover for injuries inflicted upon plaintiff by a servant of defendant in charge of his wagon and by another acting under the immediate supervision of the servant, evidence *held* to make a case for the jury, as it warrants the conclusion that the driving forward of the defendant's wagon against the plaintiff's wagon, and all that was done in an apparent effort to get defendant's wagon on its way, including the assault on plaintiff by defendant's driver and his companion, was done under the immediate supervision of defendant's servant, with his approval, and constituted in law his acts as the servant of defendant.

3. **APPELLATE PRACTICE:** Demurrer to Evidence: Rule of Review. On appeal, in reviewing the action of the trial court in sustaining a demurrer to plaintiff's evidence, the evidence is viewed in the light most favorable to plaintiff.

4. **ASSAULT AND BATTERY:** Servant Acting in Scope of Employment: Assault by Servant and Another: Concert of Action; Master Liable for All Injuries Inflicted. Participation in an assault on plaintiff by defendant's servant acting in concert with another, and while acting in the scope of his employment, in the furtherance of the business of defendant for which he was employed, being in law defendant's assault, suffices to render defendant liable for the whole of the injuries inflicted upon plaintiff.

Appeal from the Circuit Court of the City of St. Louis.—
*Hon. John W. Calhoun*, Judge.

REVERSED AND REMANDED.


*Greensfelder & Levi and H. C. Whitehill* for appellant.

(1) There being nothing in the record to show that defendants or either of them offered instructions in the nature of demurrers which the court gave at the close of plaintiff's case, the court was without authority to give said instructions of its own motion, there being a total failure of connection between the close of the plaintiff's case and the giving of said instructions. Section 1987, R. S. 1909. (2) When an instruction in the nature of a demurrer to the evidence is offered, it is a rule that plaintiff's evidence must be taken as true and that he is entitled to the benefit of every inference reasonably springing from the proof. Shamp v. Lambert, 142 Mo. App. 567; Fritz v. St. Louis etc. Ry. Co., 243 Mo. 62; Vanneman v. Walker Laundry Company, 166 Mo. App. 685; Fleishman v. Polar Wave Ice & Fuel Company, 148 Mo. App. 117; O'Malley v. Heman Construction Co., 255 Mo. 386; Whiteaker v. Ry. Co., 252 Mo. 438. (3) A master is liable for the negligent acts of his servant which causes injury to a third party, whether such acts be purely negligent or whether wanton, willful or malicious, provided such acts are within the scope of the servant's employment. Chandler v. Gloyd, 217 Mo. 394; Hellreigel v. Dunham et al., 179 S. W. 763; Fellhauer v. Railroad Co., 177 S. W. 795; Moore v. Jefferson City, etc., Co., 163 Mo. App. 266; Bouillon v. Laclede Gas Light Company, 148 Mo. App. 462; Haehl v. Wabash Ry. Co., 119 Mo. 325; Bledsoe v. West, 171 S. W. 622; Keen v. St. Louis, etc., R. R. Co., 129 Mo. App. 301; Winn v. K. C. Belt Ry. Co., 245 Mo. 406; Republic Iron & Steel Co. v. Self, 68 So. 328. A master is liable for the negligent, willful or malicious acts of his servant while acting within the scope of the employment, and mere departure from the

line of a servant's duty or conduct outside the servant's instructions, or if done in an indirect way, will not defeat the application of the doctrine of *respondeant superior.* Chandler v. Gloyd, 217 Mo. 394; McPeak v. Missouri Pacific R. R. Co., 128 Mo. 617, 30 S. W. 170; Colette v. Rebori, 107 Mo. App. 711, 82 S. W. 552; Whiteaker v. Chicago, etc., R. Co., 252 Mo. 348; Grattan v. Suedmeyer, 144 Mo. App. 719; Bouillon v. Laclede Gas Light Company, 148 Mo. App. 462; Haehl v. Wabash Ry. Co., 119 Mo. 325; Whimster v. Holmes, 177 Mo. App. 130 Richie v. Waller, 63 Conn. 155; Payton v. Clothing Company, 136 Mo. App. 577; Fensky v. Maryland Casualty Company, 264 Mo. 154 154; New Ellerslie Fishing Club v. Stewart, 93 S. W. 598, L. R. A. (N. S.) 9, 475; Boswell v. Barnum & Bailey, 185 S. W. 692; Hellreigel v. Dunham et al., 179 S. W. 763.

*Jourdan, Rassieur & Pierce* for respondent.

(1) The trial court properly sustained the defendants' demurrer to the evidence. The trial court may give instructions of its own motion. Sec. 1987, R. S. 1909. (2) (a) While all reasonable inferences will be indulged in plaintiff's favor, such inferences disappear in the face of actual facts. Mockowik v. Railroad, 196 Mo. 571. (b) While considering a plaintiff's evidence from a standpoint of a demurrer, he is entitled to every inference that can fairly be drawn from it in his favor, yet he is not entitled to a mere conclusion that a witness may draw when the facts stated show that the conclusion is without any reason. McCreery v. Railroad, 221 Mo. 18, 31. (c) Where a part of plaintiff's evidence tends to establish a prima-facie case, yet with the whole evidence it is neutralized, the demurrer is likewise properly sustained. Morrow v. Pullman Palace Car. Co., 98 Mo. App. 351. (d) If the whole testimony shows that, though a verdict be rendered for plaintiff, it would not be allowed to stand, the court should sustain a demurrer and take the case from the jury. City of Mexico v. Jones, 27 Mo. App. 534. (3) John Becker was not an employee or servant of Rolf, and Rolf was in no wise answerable for what he did. Mangan v. Foley, 33 Mo. App.

350; James v. Muehleback, 34 Mo. App. 512; Cooper v. Lowery, 60 S. E. 1015. (4) Because even if both Beckers were Rolf's servants, he would not be answerable for their fight with plaintiff, it not being in the scope of their employment or in the furerance of their master's business. Collette v. Rebori, 107 Mo. App. 711; Grattan v. Suedmeyer, 144 Mo. App. 719; Sacks v. Railroad, 192 S. W. 418; Sunderland v. Northern Express Co., 157 N. W. 1085; Muller v. Hillenbrand, 125 N. E. 808. (5) The plaintiff's petition does not state a cause of action, in that the act complained of was committed by the servant in the scope of his employment, and there is a failure of proof upon the part of the plaintiff, in that the evidence does not show that said act complained of was committed by the servant in the scope of his employment. Drolshagen v. Union Depot R. R., 186 Mo. 258.

ALLEN, P. J.—This action was instituted against the Meyer-Schmid Grocer Company, a corporation, and Robert C. Rolf, defendants, to recover for personal injuries alleged to have been inflicted upon the plaintiff by a servant of the defendants in charge of a team and wagon belonging to them. At the close of plaintiff's case the court gave two peremptory instructions, one to the effect that under the pleadings and evidence plaintiff could not recover against the defendant Meyer-Schmid Grocer Company, and the other to the effect that under the pleadings and evidence plaintiff could not recover against the defendant Rolf. It appears that the plaintiff did not except to the giving of the peremptory instruction as to the Meyer-Schmid Grocer Company, but did except to the giving of the instructions as to the defendant Rolf; and plaintiff thereupon took an involuntary nonsuit as to defendant Rolf. Thereafter plaintiff moved to set aside the nonsuit, and, upon this motion being overruled, appealed to this court.

The petition charges that on November 2, 1915, an agent and servant of defendants was driving a two-horse team and wagon, belonging to defendants, across the "McKinley Bridge" behind a wagon which plaintiff

was driving; that defendants' said servant unlawfully demanded that plaintiff drive his wagon to the side to permit defendants' team and wagon to pass, "and unlawfully, willfully and maliciously then and there made an assault upon plaintiff, for the purpose of forcing plaintiff to get his wagon to the side so that said two-horse team and wagon could pass, and then and there did strike and beat plaintiff in and about the face, head and body, and thereby injured and damaged plaintiff's right arm and left leg. And it is averred that as a result of his said injuries plaintiff has become incapacitated from doing work and will be so incapacitated in the future to his damage in the sum of $5000. It is further alleged that said acts of defendants' servant were done maliciously and without legal justification, entitling plaintiff to recover exemplary damages therefor. Judgment is prayed for $5000 actual and $2500 punitive damages.

The evidence shows that the team and "two-horse wagon" mentioned in the petition were the property of the defendant Ro f, though the wagon had upon it the name "Meyer-Sch..id Grocer Company;" and that one Harry Becker, who was upon the wagon, was an employee of defendant Rolf. The goods in the wagon belonged to the Meyer-Schmid Grocer Company, but were being hauled under a contract between that company and the defendant Rolf, upon whom alone plaintiff now seeks to fasten liability for the assault upon him.

When the controversy arose resulting in the assault, plaintiff was driving his wagon westwardly across the McKinley Bridge, i. e. approaching the City of St. Louis, and the said wagon of defendant Rolf—whom we shall hereafter term the defendant—was being driven across the bridge in the same direction. It appears that though Harry Becker was a servant of defendant in charge of the latter's team and wagon, he was not driving the team when the trouble arose, but was seated in the bed of the wagon mending a whip while his brother,

206 M. A.—33

John Becker, sat upon the driver's seat and held the reins. John Becker, it is said, was not in defendant's employ, but got upon the wagon, at Harry Becker's invitation, to ride across the river. At the time of the assault plaintiff's wagon was in front of defendant's team and wagon, and both wagons, and other traffic upon the bridge as well, had been stopped by a herd of cattle which was being driven westwardly across the bridge.

The testimony of plaintiff's witnesses is set out in appellant's abstract in narrative form. Respondent, however, has filed an additional abstract setting forth some testimony of the witnesses not included, it is said, in appellant's abstract. We shall undertake to set out the substance of the testimony of the witnesses, so far as here material, as it appears in the two abstracts filed.

The testimony of paintiff's first witness, one Cannefax, as shown by appellant's abstract, is substantially as follows:

The witness testified that he was with a friend in an automobile on the McKinley Bridge at the time mentioned, driving toward St. Louis, and that they could not proceed forward on account of a large herd of cattle in front of them; that the two wagons, viz., plaintiff's one-horse wagon and defendant's two-horse wagon, were in front of the automobile in which the witness was riding, and were on the north side of the bridge, on the "approach" on the St. Louis side of the river, plaintiff's wagon being immediately in front of defendant's wagon; that the men in defendant's wagon "hollered to plaintiff to get out of the way, plaintiff's wagon at the time being as close to the outside railing as it could be;" that plaintiff told them he could not get out of the way because of the cattle in front of him; that "they then drove the tongue of their wagon against plaintiff's wagon and tried to shove his wagon into the cattle, whereupon plaintiff said he could not get out of the way and could not run over the cattle;" that there-

upon one of these men jumped off the wagon, grabbed plaintiff by the neck and tried to pull him from the wagon, and "then went and got a stake from the Meyer-Schmid Grocer wagon and they both .ran plaintiff off of his wagon;" that there were two men on the rear wagon, one of whom was driving, the other being seated in the bed of the wagon, and that the one who first got off of the wagon called to the other, saying: "Come on lets get the Jew son of a—." The witness stated that the "other fellow" then got out of his two-horse wagon, bringing a wagon stake with him, and struck plaintiff, "who at the time was hollering and begging and pleading, and who jumped off his wagon and ran into the herd of cattle." And the witness said that he saw "both men of the Meyer-Schmid Grocer wagon strike plaintiff."

On cross-examination the witness reiterated that he saw both men from the Meyer-Schmid Grocer wagon strike plaintiff.

Further testimony of this witness set out in respondent's abstract is to the effect that he "saw the driver of the stake wagon go up and take the Jew by the neck, and that the Jew hit him with a whip; that the man who had been driving the stake wagon went back and got a stake and called to the other man, who was lying down in the back of the stake wagon, as stated above; that "at this place upon the bridge there was room for two wagons to pass, the plaintiff's wagon being close to the north side of the bridge."

The testimony of plaintiff, as a witness in his own behalf, as preserved in appellant's abstract, shows that plaintiff lived in Venice, Illinois, where he was engaged in the scrap iron and junk business; that on the day mentioned he was driving his wagon to St. Louis across the McKinley bridge from Venice, Illinois, when he came upon a herd of cattle, proceeding in the same direction, on account of which he could not pass, the cattle taking up the entire width of the bridge. He testified that he had his wagon on the north side of the bridge, "against the railing," that a stake wagon drove

up behind him and pushed into his wagon, and that "He was holding his horse so that it would not fall;" that he turned about and said to the men in the wagon behind him: "What are you trying to do, you tried to kill my horse;" that the men in the rear wagon then pushed plaintiff's wagon "Down the approach to Broadway where the coal chute is located," and that when plaintiff again asked what they were trying to do, "They said: 'Well, I will show you what I am trying to do,' and they got off of the wagon; one came to the right hand side and the other on the left hand side of the plaintiff and that each of them had stakes from the wagon."

Plaintiff's further testimony on direct-examination, as it appeared in appellant's abstract, is as follows:

"That one fellow put one foot on the wagon and one on the shaft and took hold of the side and tried to pull plaintiff off his wagon, and that when plaintiff resisted he went and got a stake from the wagon in the rear, with which he struck plaintiff upon the right hand and left foot and that each of the men from the rear wagon struck him."

On cross-examination plaintiff said that the man who came from the seat of the wagon was the one who tried to pull him from his wagon; that when this man first came up he "tried to pull the plaintiff by the leg and get into the wagon and pull plaintiff off;" that the man then returned to the rear wagon and got a stake, and then came to plaintiff's wagon and struck plaintiff; that "the other man from the rear wagon was on the other side and he also hit plaintiff with a stake." Plaintiff said that he was sure that two men from the rear wagon hit him.

According to the testimony contained in respondent's abstract plaintiff, in testifying, stated that the man who was driving the stake wagon was the only one who had a stake. And he admitted when his deposition was taken that he stated that the other man on the stake wagon did not strike him, "only grabbing hold

of his lines;'' that when he got to the office at the west end of the bridge the man who had struck him with a stake was gone; that a police officer arrested the other man on the stake wagon, and that he did not appear and prosecute the case.

The testimony of Harry Becker, as preserved in appellant's abstract, may be summarized as follows:

The witness testified that he was in the employ of the defendant Rolf ''driving a wagon for the Meyer-Schmid Grocer Company and for Bob Rolf,'' the latter paying him. He said that about four o'clock in the afternoon of the day mentioned he was returning to St. Louis from Granite City, Illinois, where he had delivered groceries, and that as soon as he completed the deliveries he was to turn into the stable. He testified that he took the team and wagon from the stable of defendant Rolf and was told by the latter to go to the Meyer-Schmid Grocer Company and get his load; that Rolf was his boss. He said that on the return trip he permitted his brother to ride with him across the bridge. He then testified that his brother ''got off the wagon and then ran back to the stake wagon and got a stake off the wagon and went after the plaintiff and poked him;'' that the witness held the lines while his brother was away from the wagon, ''both the first and second times.'' He further testified that he had been sitting in the bed of the wagon while his brother sat upon the seat and drove, and that when his brother left the wagon and committed the assault upon plaintiff the witness took the reins; that when his brother returned and got a stake from the wagon, the witness did not stop him from striking plaintiff.

According to the testimony of this witness as contained in respondent's abstract, he stated that his brother was not employed by defendant, nor did the latter know that his brother was driving the wagon; that the witness took a seat in the wagon bed to fix a whip which was out of repair; that he had no authority from defendant to allow his brother or anyone else to

drive the wagon; that when he first noticed the controversy between plaintiff and his brother, plaintiff drove his wagon past the stake wagon and "cut in so close to the stake wagon" that his brother called to Blumenfeld, and "there were curse words passed between them;" that plaintiff thereupon threw something at his brother and the latter left the stake wagon and went to plaintiff's wagon, and when the witness looked he saw plaintiff hitting his brother with a whip; that his brother then returned to the stake wagon, got a stake and returned to plaintiff's wagon. The witness stated that he took no part in the fight, except to take the stake way from his brother; that the trouble took place "off the Rolf's wagon and at least fifty feet from it."

One Zott, who was in the automobile with the witness Cannefax, after referring to the fact that the herd of cattle blocked the bridge, said: "There was a rag wagon against the cattle, and back of them was a grocery wagon;" that the grocery wagon was "driven up against the rag wagon and they could go no further;" that "they were driving the grocery wagon into the tail gate of the rag wagon, trying to push it further, and he could not go any further, and as they got near the west approach of the bridge one of the fellows jumped off the seat, ran to the Jew and tried to pull him off his wagon;" that "when the Jew resisted him, this fellow went back to his wagon and got a stake and some one of them hit him with the stake and he got off the wagon and ran to the entrance of the bridge." And he said that both men from the rear wagon had stakes, "one on one side and one on the other." On cross-examination he said that he did not know which one of these men hit plaintiff with the stake.

According to respondent's abstract, this witness further stated that plaintiff used his whip upon the man who first ran to his wagon and tried to pull him off.

In passing upon the demurrer to the evidence, the question arises as to whether the acts of John Becker, as shown by the evidence, may be legally attributed to

the defendant. As appears above, all of the evidence touching the matter is to the effect that John Becker was not in defendant's employ, but was upon the wagon at the invitation of his brother, Harry Becker, who was defendant's servant in charge of the team and wagon. And there is affirmative testimony that Harry Becker had no authority to allow others to drive the team.

In Mangan v. Foley, 33 Mo. App. 250, the defendant was the owner of a team and wagon which was regularly driven by one Crouch, his servant. On the day in question Crouch did not drive the team and wagon, as was his custom, but engaged one Ramsey to drive in his stead; and while Ramsey was thus in charge of the team and wagon, plaintiffs' child was run over by the wagon and killed. It was held that the defendant was not liable for Ramsey's negligence. In the course of the opinion this court said:

"Crouch is employed to drive this team; instead of doing that which he is employed to do, he does something which he is not employed to do, i. e., hires another man, without the consent or approval of the master, to drive the team, the accident occurs, the master cannot be said to have caused the accident by his servant, and is therefore not responsible.

"In this case the evidence does not show any authority, either special or general, by which we can infer even the right of Crouch to employ Ramsey to drive the team. In no way is the master connected with the employment of Ramsey, all the evidence being the other way, and upon what principle a master can be held for the act of a servant, whom he has not employed and to whose employment he has not even consented, is quite difficult to comprehend."

In James v. Muehlebach, 34 Mo. App. 512, defendants' servant, the driver of their wagon, called one Ehrhard to assist him in doing the master's work, and while unloading some empty barrels from the wagon Ehrhard struck and injured the plaintiff. It was held that the master should not be held liable unless the

servant's negligence combined with the particular negligence of the third party in causing the injury. After reviewing a number of authorities touching the matter, the court, through ELLISON, J., said:

"Our conclusion is that Ehrhard was not the servant of the defendants, and if they are to be held liable in this case it must be through the act of the driver. If, therefore, the driver himself negligently threw the barrel, the case is settled at once against the defendants; but if Ehrhard threw it, it must appear that he was directed or requested to do so by the driver. Such direction or request need not, necessarily, be by express words directed to Ehrhard by the driver, but the act must be shown to have been done for the driver and with his assent and by reason of his wish or desire."

A judgment for the plaintiff was affirmed, the court saying that the evidence clearly tended to show that the driver was present and that Ehrhard threw off the barrels for the driver, under the latter's immediate supervision.

In the recent case of Slothower v. Clark, 191 Mo. App. 105, 179 S. W. 55, decided by the Kansas City Court of Appeals, the action was one for personal injuries received in a collision between a hearse on which plaintiff was riding and an automobile belonging to the defendant. It appears that defendant's automobile was in charge of his chauffeur, and it was held that the chauffeur was about the master's business at the time, but in fact the chauffeur had permitted a friend, one Sweeney, to ride with him and, at Sweeney's solicitation, had exchanged seats with the latter, letting him take charge of the steering wheel, and Sweeney was driving when the collision occurred. Touching this matter the court said:

"But it is insisted, that at the time of the collision, Sweeney was running the machine, the chauffeur, as we have seen, having permitted him to take charge of the steering wheel, he sitting beside him. At the trial the parties seemed to consider it was necessary to show

that at the time of the collision, the chauffeur was driving. In view of the evidence we think that is a matter of no consequence or importance. When the chauffeur let Sweeny take the wheel, he remaining on the seat beside him, Sweeny's acts, practically speaking, were his, and his act in turning the wheel over to Sweeny was the act of defendant, for it was done in the defendant's service and while carrying out the chauffeur's employment. It was not the act of a servant abandoning his master's service and turning it over to another.

" 'In James v. Muehlebach, 34 Mo. App. 512, 518, we said that, 'If a servant in charge of his master's carriage should take a stranger with him into the driver's seat, hand him the reins and tell him to drive at a run and an injury happen in consequence of the speed, the master must answer for the damage, for the negligence was that of his servant.

" 'But not so if the servant had quit the carriage and substituted the stranger in charge, generally, in his stead, without the knowledge of the master. For if an injury happen it is not the act of the servant for whom only is the master liable. In Booth v. Mister, 7 Carr. & P. 66, a servant in charge of his master's cart gave over the reins to one in the cart with him, an injury happening in consequence of the negligent driving, the master was made to respond.

" 'Lord Abinger said, 'As the defendant's Servant was in the cart, I think that the reins being held by another man makes no difference. It was the same as if the servant had held them himself.' That statement of the law is supported by Hollidge v. Duncan, 199 Mass. 121; Thyssen v. Ice Co., 134 Iowa, 749; Campbell v. Trimble, 75 Tex. 270, 272; Wellman v. Miner, 44 N. Y. Supp. 417; Bamberg v. International Ry., 103 N. Y. Supp. 297; Kilroy v. D. & H. C. Co., 121 N. Y. 22; Bk. of Cal. v. W. U. Tel. Co., 52 Cal. 280, 290.''

In Allen v. Quercus Lumber Co., 190 Mo. App. 399, 177 S. W. 753, the cases of Mangan v. Foley and James v. Muehlebach, supra, were considered by the Spring-

field Court of Appeals, but were held to be inapplicable to the facts involved; the opinion in the Allen case proceeding on the ground that the servant, who was a foreman, had authority to engage others to assist in carrying on the master's business.

In Wertherman v. Handy, 198 S. W. 459, the Springfield Court of Appeals again considered the question as to whether the master is bound by the negligence of one to whom the servant has undertaken to delegate the duties imposed upon the latter. In the course of the opinion the court said:

"There is considerable conflict in the authorities on this question of the liability of the master for the negligent act of a third party whom the servant without authority calls to his assistance, or substitutes for himself in the performance of the master's business. Whenever the facts show combined or commingled acts of negligence on the part of the servant and such third party, or are such that the servant can be said to be a party to, or to have participated in the negligent act of the third party, then there is liability. This is true because the law holds every person who is guilty of negligence in any way contributing to the injury responsible therefor, and the master, being liable for the negligent acts of one of the parties, is responsible for all. His responsibility, however, is bottomed on the negligence of his servant. [James v. Muehlebach, 34 Mo. App. 512, 518, and cases there cited; Hollidge v. Duncan, 199 Mass. 121, 85, N. E. 186, 17 L. R. A. (N, S.) 982; Board of Trade Building Corporation v. Cralle, 109 Va. 246, 63 S. E. 995, 22 L. R. A. (N. S.) 297, 132 Am St. Rep. 917.]"

After citing and quoting from Mangan v. Foley, supra, James v. Muehlebach, supra, and Slothower v. Clark, supra, and after reference to other cases as well, the court held that the defendant was not there liable for the act of the third person, on the ground, however, that the defendant's agent, one Ellis, had undertaken to turn over entirely to a third person the duties en-

trusted to him and was not present when the negligence
of such third person took place.

Touching the question as to the liability of the master for the negligent or tortious act of one whom his servant has undertaken, without authority, to substitute in
the servant's place in the performance of the duties of
the master, there is considerable conflict of authority.
The view taken by the court in the Slothower case, supra,
appears to be sound. In this connection see: Thyssen v.
Davenport Ice, etc., Co., 134 Iowa, 749, 13 L. R. A. (N.
S.) 572; Geiss v. Twin City Taxicab Co., 120 Minn. 368,
45 L. R. A. (N. S.) 382; Osteen v. South Carolina Cotton
Oil Co.,—S. C.—, L. R. A. 1916B, 629; Hollidge v. Duncan, 199 Mass. 121. In accordance with this view, if a
servant in charge of his master's wagon takes a stranger
into the wagon with him and turns the reins over to the
latter, the servant remaining in the wagon, the master is
liable for the negligence of such driver, upon the theory
that the servant remains in charge of the team and
wagon, and the negligence of the person driving is in
fact the servant's negligence for which the master must
respond.

In the instant case it is not sought to hold the defendant for negligence on the part of John Becker with
respect to the driving of the vehicle, but to fasten liability upon the defendant for a willful tort committed upon plaintiff by both John Becker and defendant's servant
Harry Becker. And if the evidence can be said to show,
prima facie, that this assault was committed by them
jointly, in the furtherance of defendant's business, namely, in respect to the progress of the wagon, then, we think,
the case made was one for the jury.

It may be stated as established doctrine, well supported by the authorities, that the master is not liable for
the acts of a stranger, where the servant, without authority so to do, delegates a particular duty in its entirety
to such stranger and is not present and does not in any

manner cooperate with the latter in the performance thereof. [See Geiss v. Twin City Taxicab Co., supra, 45 L. R. A. (N. S.) 384 and note.] In some cases the master has been held liable upon the theory that it is negligence on the part of the servant to delegate the preformance of a duty resting upon him to another, without authority to do so, or that it is the duty of the servant to prevent intermeddling with his duties by others when known to him [In this connection see Dimmitt v. Railroad, 40 Mo. App. 654.] The courts have frequently placed the liability of the master upon the ground that a stranger, to whom the servant has delegated his duties, is a mere instrumentality by which the servant performs such duties, and that therefore the stranger's negligence is that of the servant. This doctrine appears to be sound enough when applied to a case where the servant does not delegate his duties in the entirety, but remains present and the duties performed by the stranger are performed under the eye and the immediate supervision of the servant, as in the Muehlebach and Slothower cases, supra.

In the case before us the testimony of Harry Becker shows that he saw and knew all that took place from the very beginning of the controversy resulting in the assault upon plaintiff. According to his testimony—which is the only testimony which tends to so show— the controversy began when plaintiff drove his wagon by the defendant's wagon and got in front of the latter. And it can be readily inferred from the evidence as a whole that Harry Becker observed all that took place thereafter, and sanctioned it. The evidence is that the "fellows" in defendant's wagon shouted to plaintiff to get out of the way, and that "they" drove the tongue of "their" wagon against the rear of plaintiff's wagon and pushed plaintiff's wagon and team forward until his horse was pushed against the cattle, obviously in an effort to drive defendant's wagon forward. While the reins were held by John Becker, we think that the evidence war-

rants the conclusion that the driving forward of the wagon in this manner, and all that was done in an apparent effort to get defendant's wagon on its way, was done under the immediate supervision of Harry Becker. with his approval, and constituted in law his acts as the servant of the defendant.    This phase of the evidence, we think, has an important bearing upon the contention of respondent's learned counsel that even though both John Becker and Harry Becker be regarded as servants of the defendant, nevertheless the assault upon plaintiff was not done in the scope. of their employment while furthering the defendant's business.

In Whiteaker v. Railroad, 252 Mo. 438, l. c. 457, 160 S. W. 1009, it is said, by LAMM, J.: "It would be mere ostentatious display of industry and learning to analyze the fourscore cases appellants cite to sustain their contention that the corporate defendant is not liable on the facts of this record, nor the twoscore that respondent cites to sustain his contention contra.    This is so because, at bottom, the doctrine of all well-reasoned cases is that, under the maxim *respondeat superior,* the master must answer in certain circumstances for the wrongful act of his servant precisely as the principal must answer for those of his agent.    The general rule is that the maxim, *respondeat,* applies when the servant, in the line of his employment about his master's business, seeks to accomplish his master's purposes and in doing so acts negligently, or willfully and maliciously, or even contrary to his orders or criminally, in some instances.    That general rule is hornbook doctrine and beyond dispute."

And in that connection the following cases are cited; Garretzen v. Duenckel, 50 Mo. 104; Perkins v. Railroad, 55 Mo. 201; Farber v. Railroad, 116 Mo. 81; Brill v. Eddy, 115 Mo. 596; Haehl v. Railroad, 119 Mo. 325; Farber v. Railroad, 139 Mo. 272.    In Garretzen v. Duenckel, supra, after a consideration of many other authorities, the learned author quotes approvingly from the opinion in Howe v. Newark, 12 Allen 40, as follows:

"In an action of tort in the nature of an action on the case, the master is not responsible if the wrong

done by the servant is done without his authority, and not for the purpose of executing his orders or doing his work. So that if the servant, wholly for a purpose of his own, disregarding the objects for which he is employed, and not intending by his act to execute it, does an injury to another not within the scope of his employment, the master is not liable. But if the act be done in the execution of the authority given him by his master, and for the purpose of performing what the master has directed, the master will be responsible, whether the wrong done be occasioned by negligence or by a wanton or reckless purpose to accomplish the master's business in an unlawful manner." [See also: Hellriegel v. Dunham et al., 192 Mo. App. 43, 179 S. W. 763; Shamp v. Lambert, 142 Mo. App. 567, 121 S. W. 770; Bouillon v. Laclede Gas Light Co., 148 Mo. App. 467, 129 S. W. 401; Fellhauer v. Q. O. & K. C. R. Co., 191 Mo. App. 137, 177 S. W. 795; Maniaca v. Interurban Express, 266 Mo. 633, 182 S. W. 981.]

In the instant case when the evidence is viewed in the light most favorable to plaintiff, we think it cannot be well doubted that the evidence supports the conclusion that this difficulty arose over an effort on the part of John Becker and Harry Becker to further defendant's business which Harry Becker had in charge, namely, the driving forward of defendant's wagon across the bridge; and that the assault upon plaintiff, which, according to the evidence touching the matter, except the testimony of Harry Becker, was joined in by both John Becker and Harry Becker, arose out of and was an integral part of such effort to further defendant's business, viewing the evidence in the light most favorable to plaintiff, it appears that after the effort had been made to shove plaintiff's wagon forward or out of the way, and when defendant's wagon could proceed no further, John Becker left his seat upon the wagon and ran to plaintiff's wagon attempting to pull plaintiff therefrom; that not succeeding in this he returned to defendant's wagon, called upon his brother

Harry Becker to join him, and both took stakes from defendant's wagon and ran to plaintiff's wagon, "one on one side and one on the other," and assaulted plaintiff. Under this evidence, and in the light of what we have said above, we think that the proof shows prima-facie responsibility on the part of the defendant for such assault.

Respondent says that "plaintiff's testimony as to how the fight started is unbelieveable," and calls attention to the fact that plaintiff's wagon was against the north railing of the bridge, and that one witness said that "at this place upon the bridge there was room for two wagons to pass." And it is said that therefore there was no occasion for pushing plaintiff's wagon forward. This argument, however, avails nothing upon a consideration of the ruling on the demurrer to the evidence. The evidence warrants the conclusion that the men upon defendant's wagon, for some reason, sought to go forward by trying to get plaintiff's wagon forward or out of the way. Whether they thought they might pass the cattle by driving as far to the right as possible, or were compelled to remain behind plaintiff's wagon because of other traffic upon the bridge, we cannot tell from this record, nor do we deem it of importance in passing upon the ruling below upon the demurrer.

If any doubt may be entertained as to defendant's responsibility for injuries inflicted upon plaintiff by John Becker, we may add that participation in the assault by Harry Becker, while acting within the scope of his employment, in the furtherance of the business of defendant for which he was employed, being in law defendant's assault, suffices to render defendant liable for the whole of the injuries inflicted upon plaintiff. [See Schafer v. Ostman, 172 Mo. App. 602, 155 S. W. 1102].

We think that plaintiff made a prima-facie case, and it follows that the judgment should be reversed and the cause remanded. It is so ordered. *Becker, J.*, concurs.