HARVEY LEE BASS and MABEL BASS, Appellants, v. KANSAS CITY JOURNAL POST COMPANY, a Corporation.—148 S. W. (2d) 548.

Division One,   March 13, 1941.

*Alfred H. Osborne, Will H. Hargus, C. E. Groh* and *Rosenberg, Hargus & Koralchik* for appellants.

*Clay C. Rogers, Lyman Field* and *Moseman, Rogers & Bell* for respondent.

HAYS, J.—This is an action for wrongful death under Section 3263, R. S. Mo. 1929, brought by the mother and father of Noel Bass, deceased, an unmarried minor. The circuit court, at the

close of all of the evidence, directed a verdict for defendant. Plaintiffs appealed. It is conceded that Bass died as a result of injuries received by him in an accident when an automobile, in which he was riding and which was owned and operated by one Forrest Thompson, collided with another car traveling in the opposite direction. The evidence shows conclusively that the accident was caused by Thompson's negligence in driving to the left-hand side of the center line of the road and immediately into the path of the on-coming car. Contributory negligence was neither pleaded nor proved and the sole question for our decision is whether or not respondent is liable for the negligence of Thompson under the doctrine of *respondeat superior*.

The facts bearing upon this issue, as disclosed by the evidence most favorable to the appellants (plaintiffs below), are these: Respondent publishes daily newspapers. Its principal place of business is in Kansas City. Some six months before the accident here involved, one Arthur Brown, who was also an occupant of the Thompson car at the time of this collision, entered into an oral contract with respondent with regard to delivering papers within a designated area in Jackson County. The contract was negotiated on behalf of respondent by one Knud Elben, its district manager, and it is conceded that the negotiation of the contract was within the scope of his authority. Brown's testimony and that of Elben, with reference to the terms of the contract, is somewhat conflicting. We, of course, accept in this connection the evidence most favorable to plaintiffs and draw therefrom all reasonable inferences favorable to them. Under the contract Brown was to receive from respondent certain bundles of newspapers, each one of which was addressed to a carrier in a town in Brown's territory. He was to deliver these bundles to the addressees. For so doing he was to receive weekly from the respondent a specified sum. During the continuation of the contract this sum was changed by agreement, but at the time of the accident Brown was paid $22 per week. In addition to the bundles of papers, above mentioned, Brown was to get from respondent, at specified rate, certain other papers which he was to deliver to subscribers in his territory. The price of these papers, payable to respondent, was to be deducted each week from the $22 which respondent was to pay Brown. Brown thus received a weekly check for the difference between this amount and the $22. From each subscriber Brown received a fixed amount per week for the papers delivered to the customer, and he retained the money so received.

Whenever any person residing in Brown's territory contacted the Journal Post directly for a subscription the matter was referred by the paper to Brown, and any complaints received in the newspaper office in regard to the failure of a subscriber to get his papers were transmitted to Brown.

At the time the contract was made Elben pointed out to Brown

that he would have to have an automobile in order to make these deliveries and Brown stated that he owned and would furnish a car for that purpose. Brown paid for the upkeep. of the car and for the gasoline and oil used therein. There was no provision in the contract about the right of respondent to designate the route to be taken by Brown in making deliveries or in serving customers or about the right of respondent to specifically direct other details of the work. The record does not show that respondent ever attempted to exercise such right or to give any directions to Brown about the manner in which he should perform his work. There was nothing said by the parties about the duration of the contract. In the absence of such express stipulation either party was at liberty to terminate it at will. While Brown had gone over the route with a previous carrier, he had not purchased the route from this person but had negotiated solely and directly with Elben.

During the examination of Brown as a witness for plaintiffs the following occurred out of the hearing of the jury: "MR. HARGUS: I want to inquire along this line, Judge. Mr. Rogers is here representing the Travelers Insurance Company. THE COURT: What is that? MR. HARGUS: Mr. Rogers is here representing the Travelers Insurance Company. He is defending this under some policy of insurance. I want to show by this carrier (Brown) that he did not carry the insurance, but that the Journal-Post did. MR. ROGERS: He can't show that at all. . . . THE COURT: It is a matter for me to take into consideration in passing on the demurrer, but not for the jury. You may proceed. (Exceptions saved by plaintiffs.)" Toward the close of the case the following occurred also out of the presence of the jury: "MR. HARGUS: We have it in the record that Mr. Rogers is representing the Travelers Insurance Company, and it certainly would not be error, in view of the fact we are not going to get to the jury. . . . THE COURT: It is a proper matter to . . . MR. HARGUS: . . . to put Mr. Brown on and ask him whether or not he individually carried any liability insurance. MR. ROGERS: Why, I can agree with you on that. Do you want to know what facts are? Well, as far as I know he didn't and we had none on him. MR. HARGUS: Do you agree he did not? MR. ROGERS: I say, as far as I know, he did not, as far as the case is concerned, yes. MR. HARGUS: He did not. All right. That takes care of that."

We turn now to the events immediately leading up to the fatal accident. For several days prior to June 19, 1938, Brown had been having trouble with his car. On one or two occasions he secured Thompson's car to use in making his deliveries, paying the expenses thereof. His own car meanwhile had been repaired, but on the morning of the 19th was too "tight" to properly make the run. He again arranged with Thompson to use the latter's automobile. Thompson was to do the driving and Brown was to pay him a reasonable amount

for the use of the car. Noel Bass and his sister Betty Bass went on the trip as guests. Betty Bass is described in the record as Brown's "girl friend." Thompson drove and Noel Bass occupied the front seat with him. Brown and Betty were in the rumble seat. All of the members of the party except Thompson took part in "throwing" the papers; that is, delivering them to the subscribers. The car was driven along Highway 40 in Jackson County in a westerly direction and the party met another car approaching from the west. For some unexplained reason Thompson suddenly swerved to the south or left hand traffic lane and beyond the center line of the highway with the inevitable result of a collision with the on-coming car. Bass was killed and Brown seriously injured. Brown was taken to a hospital where he remained sometime. During this period Brown's brother continued to carry the papers for respondent on this route, no objection being made by respondent to the arrangement, and respondent continued to pay Brown at the regular rate.

■ Under the doctrine of *respondeat superior* a principal or master is held liable to a third person for the torts of his agent or servant, even though the specific tortious act was not commanded nor expressly authorized by the former, provided that the latter has committed such act while engaged in an activity falling within the scope of his authority or employment. [Douglass v. Stephens, 18 Mo. 362; American Law Institute, Agency Restatement, sec. 212.] The doctrine does not apply to one who employs an independent contractor. [Skidmore v. Haggard, 341 Mo. 837, 110 S. W. (2d) 726.] It is true that under certain circumstances one who has employed an independent contractor may become liable for the latter's tort, but this is because of the existence of certain special circumstances none of which are claimed to be present in this case and which need not now be considered. [See McCleary, Liability of an Employer for the Negligence of an Independent Contractor in Missouri, 18 St. Louis Law Rev. 289.] The reason for this distinction made between the case of an agent or servant, on the one hand and that of an independent contractor on the other, is largely historical. But it is also based on the fact that one who has work performed by an agent or servant is in a position to exercise more or less detailed control over the manner in which the work is done. The employer of an independent contractor, on the other hand, controls only the final result and not the means by which it is accomplished.

■ The first question for our consideration, then, is this: Was Brown an agent or servant of respondent? or was he an independent contractor? If he were the latter, the respondent could not possibly be held liable for the death of Bass; for Thompson, whose negligence was the active agency causing such death, sustained no relationship to respondent except through Brown. Even though it be contended that Elben knew that Thompson was to drive on the trip on June 19th

and made no objection thereto, this could not alter the truth of the last statement for if Brown were an independent contractor, respondent would have no right to control his selection of a helper or assistant. Certainly this would be true in the present case as there was neither pleading nor proof that Thompson was a manifestly incompetent driver. In addition we may point out that plaintiffs' petition expressly alleges that at the time of the accident "the defendant, through its agent, servant and employee was driving and operating an automobile. . . ." The plaintiffs thus rely solely upon the theory that Brown was respondent's agent and that Thompson was merely an instrumentality through which Brown was performing his duty.

In the Skidmore case, supra, we had occasion to define the status of a servant as distinguished from that of an independent contractor. We there adopted certain definitions contained in the American Law Institute, Agency Restatement, sec. 2: "A servant is a person employed by a master to perform service in his affairs whose physical conduct in the performance of the service is controlled or is subject to the right to control by the master. An independent contractor is a person who contracts with another to do something for him, but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking." In this connection attention may also be called to Barnes v. Real Silk Hosiery Mills, 341 Mo. 563, 108 S. W. (2d) 58; Flori v. Dolph (Mo.), 192 S. W. 949; Coul v. Peck Dry Goods Company, 326 Mo. 870, 32 S. W. (2d) 758; Maltz v. Jackoway-Katz Cap Company, 336 Mo. 1000, 82 S. W. (2d) 909, and other Annotations in 19 A. L. R. 1168; 20 A. L. R. 684; 61 A. L. R. 223; 75 A. L. R. 725; Ann. Cases, 1918-C, 672.

In the Skidmore case we pointed out a number of considerations to which weight may be given in determining, the status of an employee as servant or as independent contractor. No one of these various factors is in itself controlling; but each, in accordance with the circumstances of the given case, will be given weight. Among others is the custom existing in the locality or in the particular business involved, the skill required of the employee, the permanent or temporary character of his employment, the method of payment and the fact that the employee did or did not perform similar services for other persons. The primary factor, however, remains the extent of control exercised by the employer over the methods to be adopted by the employee. The master controls not only the result to be accomplished by the servant's work, but the details of the manner in which such work is done. The employer of the independent contractor controls the result accomplished only.

If Brown's relationship to respondent had been confined to the delivery of papers to individual subscribers under the conditions

of his contract, there could be no doubt as to his status. He purchased these papers from respondent and he resold them to the customers. As to such activity he was simply a retail dealer. No question of employment or service could be raised.

When, however, we consider the work of Brown in delivering bundles of papers to other carriers, the problem becomes more difficult. Appellants' contend that in doing this work Brown acted as a servant of respondent, and that the sum of $22 per week paid him was a wage or salary. Respondent, on the other hand, says that Brown was acting as a private carrier of goods; and, as such, was an independent contractor and not a servant; that the $22 per week is to be viewed as a rate similar to the freight rates charged by a railroad or express company and was not a wage.

We have examined the many cases cited by both parties. Some of them are entirely dissimilar in their facts to the present situation. The Missouri cases most closely in point are Skidmore v. Haggard, supra; Hoelker v. American Press, 317 Mo. 64, 296 S. W. 1008; Coul v. Peck Dry Goods Company, supra; and Semper v. American Press, 217 Mo. App. 55, 273 S. W. 186.

These cases and the case at bar contain many features in common. In each of the cited cases, as in this case, an employer was sought to be held under the doctrine of *respondeat superior* for the tort of an employee claimed by the plaintiff to be a servant of the employer and by the defendant to be an independent contractor. In each of the cases the employee was paid by the day, week or hour; in each the contract of employment was terminable at will; in each the employee furnished his own means of conveyance and paid for its operation and upkeep.

In the Skidmore and Coul cases the immediate tort-feasors were held to be independent contractors, so that the defendants were not liable for their acts. On the other hand, in the Hoelker and Semper cases the employees were held to be servants and liability of the defendants was sustained. In all of the cases, except the Skidmore case, the contracts, between the defendants and their alleged agents, were oral; but in the Skidmore case a written contract was involved.

Appellants attempt to distinguish the Skidmore case from the case at bar, because the written contract there involved contained a specific provision to the effect that the defendant company should have no control over the manner in which its employee should perform his work. However, we are not at liberty to presume that the right of control was retained in Brown's contract simply because nothing was said by the parties either one way or the other about the matter. In the Skidmore case there was far more actual control exercised over the employee as to the manner in which his work was performed than in the case now before us. In this case Brown's contract of employment must be read in the light of the practical

construction placed thereon by the parties; and, when so understood, no provision for the exercise of control by respondent can be implied therein. In this respect the present case is closely analogous to Coul v. Peck Dry Goods Company, supra.

It is difficult to separate the two classes and kinds of work which Brown agreed to do. His contract was an entire one. It contemplated both the retail sales of newspapers to individual customers and the delivery of bundles of papers to other carriers. With regard to the physical character of work, the parties contemplated a relationship of independent contract and not of service. If this court should conclude that the parties had a different intention in regard to the delivery of bundles, we would be resignedly so concluding without any real basis therefor in the record before us. We are not holding that parties cannot, by an express and clear agreement, create a situation in which for one purpose the employee will be a servant and for another an independent contractor. But there is no evidence whatever here that they intended so to do. On the contrary the evidence, without question, demonstrates the intention of the parties that Brown should be an independent contractor as to all services performed for respondent.

But if the relationship of master and servant did not exist between Brown and the respondent, no such relation could have come into being between the respondent and Thompson, for the relationship of the latter was wholly with Brown. If Thompson was anyone's agent he was the agent of Brown. Therefore, such cases as Blumenfeld v. Meyer-Schmid Grocer Company, 206 Mo. App. 509, 230 S. W. 132, relied upon by appellants, can have no application, nor are we called upon to determine the question of the liability of a master to a guest riding in a vehicle at the request and invitation of a servant, which has been briefed. For the reasons above stated it is clear that the trial court properly directed a verdict for the defendant.

The appellants also complain that the trial court committed error in refusing to let them show that the case was being defended by an insurance company under a policy carried by the respondent. In this connection the record shows the following: During the examination of the witness Brown the jury was excused and the following proceedings were had in their absence: "MR. HARGUS: I want to inquire along this line, Judge. Mr. Rogers is here representing the Travelers Insurance Company. THE COURT: What is that? MR. HARGUS: Mr. Rogers is here representing the Travelers Insurance Company. He is defending this under some policy of insurance. I want to show by this carrier that he did not carry the insurance, but that the Journal-Post did. MR. ROGERS: He can't show that at all. MR. HARGUS: There is a case on it, if you have read . . . THE COURT (interrupting): It is a matter for me to take into consideration in passing on the demurrer, but not for the

jury. You may proceed." [Exceptions saved.] Again at the close of the case when witness Elben was on the stand in rebuttal, the following occurred out of the hearing of the jury: "MR. HARGUS: We have it in the record that Mr. Rogers is representing the Travelers Insurance Company, and it certainly would not be error, in view of the fact we are not going to get to the jury . . . THE COURT (interrupting): It is a proper matter to . . . MR. HARGUS (continuing): . . . to put Mr. Brown on and ask him whether or not he individually carried any liability insurance. MR. ROGERS: Why, I can agree with you on that. Do you want to know what the facts are? Well, as far as I know he didn't and we had none on him. MR. HARGUS: Do you agree he did not? MR. ROGERS: I say, as far as I know, he did not, as far as the case is concerned, yes. MR. HARGUS: He did not. All right. That takes care of that." It will be noted that the original offer of this evidence was not in proper form. If admissible at all it was competent only on the issue of agency. [Boten v. Sheffield Ice Co., 180 Mo. App. 96, 166 S. W. 883.] But the offer was not limited to that specific issue. [Wigmore on Evidence (3 Ed.), sec. 17.] Furthermore, in the nature of things Brown could not know whether or not the defendant carried insurance. His testimony on that portion of the matter would necessarily have been hearsay unless his knowledge came to him in the form of an admission from a duly authorized agent of the defendant. But the alleged proffer says nothing about any such admission. Finally it is to be noted that counsel agreed on this specific fact. Apparently their agreement was not brought to the notice of the jury. Of course if evidence is competent for the consideration of the trial court in passing on the demurrer, it is competent to go to the jury. But appellants took no steps to get it to the jury at this time and relied upon the agreement of counsel. Appellants are not in a position now to assign error on this ground.

It follows, therefore, that the judgment of the trial court must be affirmed. It is so ordered. All concur.