### GREAT AMERICAN INDEMNITY CO. v. FLENIKEN et al.
#### No. 10247.

Circuit Court of Appeals, Fifth Circuit.

Feb. 1, 1943.

Rehearing Denied March 12, 1943.

Writ of Certiorari Denied May 17, 1943.

See 63 S.Ct. 1167, 87 L.Ed. ——.

published by the Press. Brought under Louisiana statutes, which authorize the action not as a matter of substantive right but of procedure, Mock v. Maryland Casualty Co., La.App., 6 So.2d 199, and, therefore, do not render the insurer liable in any case in which the named insured would not be, recovery depended upon whether a case of liability against the Press was made out. The claim was that Neyland, who was driving the car for Ewell, a regular carrier on that route, was an employee of the Capital City Press, and, therefore, a person for whose negligence it was liable. The defendant vouched in as third party defendants, first, United Employers Casualty Company, and, next, the Wm. Wolf Bakery, Inc., and that company in turn vouched in the Press. There was a trial to a jury, a motion of the third party defendants and of the defendant appellant for a verdict on the ground that the evidence had not shown that Neyland was a servant either of the Press or of the Bakery for whose acts in driving the car they would be liable, but that quite to the contrary, it had shown that he was not employed by or working for them at all; that he was not their servant but an employee of an independent contractor whose activities in driving the automobile neither the Press nor the Bakery could or did control or supervise. The Bakery's motion was granted, and it, and all the other defendants brought in by, and as a result of, the third party proceedings, were dismissed from the case. Defendant appellant's motion was denied, and plaintiff had a verdict for $20,000.00.

Appellant is here insisting that there was error in not directing a verdict in its favor because the plaintiff not only failed to make out a case, but the undisputed evidence affirmatively showed that Neyland was neither a servant, agent or employee of the Press, but an employee of one Ewell, and that Ewell was not a servant of the Press but an independent contractor for whose actions the Press was not responsible. It is urged, in the alternative, that if appellant was wrong in this, the court erred in dismissing the cause as to the third party defendants. The evidence is without conflict. It shows that the appellant insured Capital City Press, a newspaper publisher and distributor, under a non-ownership automobile policy[1] obligating it "to

Benj. B. Taylor, C. V. Porter, and L. W. Brooks, all of Baton Rouge, La., for appellant.

Bert E. Durrett and Calvin E. Hardin, Jr., and C. C. Bird, Jr., all of Baton Rouge, La., and Gordon Boswell, of New Orleans, La., for appellees.

Before SIBLEY, HUTCHESON, and HOLMES, Circuit Judges.

HUTCHESON, Circuit Judge.

Brought directly against the insurer of the Capital City Press, the suit was for damages for personal injuries caused by an automobile driven by one Robert Neyland while delivering to subscribers papers

---

[1] Attached to the policy was an "Employer's Non-ownership Liability Schedule". As material to this suit, it agreed that such insurance as is afforded the named assured (Capital City Press) should apply, with respect to automobiles not

pay all sums which the named assured shall become liable to pay as damages imposed by law or arising out of bodily injuries, including death, at any time resulting to any person". The Press publishes and distributes two newspapers in Baton Rouge. C. P. Manship is its president and Alvin E. Sholar is its circulation manager. The circulation of papers is handled through carriers operating under oral contracts under a plan known as the Little Merchants plan. The carriers are not bonded. They collect from their own customers and keep the money for themselves. They are not carried on the publisher's records or payrolls or in any manner treated or dealt with as employees. No social security tax was paid by the Press on their account. Ewell was one of these carriers. Under his contract he was to be supplied with papers until the cost of same amounted to the usual motor allowance to rural route carriers of about $1.00 per month per mile on the route, and the price of the papers furnished him never amounted to as much as the car allowance. He supplied subscribers with their papers, collecting from them and keeping all the money he collected. He furnished his own car and maintained it at his own expense, drove it or employed others to drive it, at his option. The Press never employed any help for him, never told him whom he might or might not employ. He was in complete charge of his route and of the delivery of papers to his customers. No attempt was made by the Press to supervise or direct Ewell or anyone he might employ in regard to the driving or use of the car on the way in which he should deliver the papers. Nobody from the Press ever went on his route with him. Concerned as it undoubtedly was in maintaining and increasing circulation, it would furnish carriers the names of newcomers on their routes and for two weeks would furnish the papers without cost for delivery to these newcomers. It also furnished free of charge to subscribers and carriers metal boxes to

protect the papers, and while no supervision or direction of any kind was maintained over any of the carriers, of course, if enough subscribers should complain or if the Press believed that the carrier contractor was not sufficiently furthering the purpose of the contract to maintain and increase circulation, and that it was to the interest of the Press to terminate the contract and get another carrier, it could and would do so. Each carrier's contract covered a particular route and each agreed that he would not infringe on the routes of others. The Press knew that Ewell was buying bread from Wolf Bakery and delivering it to his customers on his route, and it not only did not object to this but was glad for him and other carriers to handle bread or any other commodity on the route, as this would tend to make them more satisfied with and permanent on their routes and more effective in furthering the purpose for which the contracts were made. There was evidence that some of the carriers, but not Ewell, had employed young boys to assist in making their deliveries, and that the Press had instructed them that this was a violation of law. There was evidence too that the papers carried advertisements giving their subscription rates as: one week by carrier, 15¢, and a statement that subscribers failing to get their papers promptly should notify the Circulation Department. The Press kept a truck and four colored porters on duty whose business it was to deliver a paper if a carrier failed to deliver one to a subscriber. Many persons subscribed direct to the Press, and the proper carrier was then instructed to deliver the papers. Some of the subscribers made payment for their papers direct to the Press, and these payments were turned over by the Press to the carriers. To persons who subscribed direct, the Press sent bills saying that they would have to stop delivering the paper unless check was sent to cover the bill. Ewell took Neyland to the Capital City Press to identify him and arranged so that Neyland could get the papers for him.

---

owned by it, to the use of any automobile or motorcycle of the private passenger type in the business of the named assured (newspaper), that the advanced premium for the insurance is based on the application of rates stated in the schedule to persons in Class One. The clause provided:

"Class 1 consists of the following persons provided their usual duties in the business of the named assured include

the use of automobiles as described in Par. 1: (a) all employees including officers of the named assured compensated for the use of such automobiles by salary, commission, terms of employment or specific operating allowance of any sort; (b) all direct agents or representatives of the named assured."

In the schedule of class one employees attached to the policy appears the name of G. D. Ewell.

Ewell's contract as to the Times covered only part of his route and as to the Advocate, the other paper, it covered the entire route. The president of the company testified that the paper owed its local advertisers the duty of delivering papers in the section covered by Ewell and that in securing Ewell and the other carriers to deliver the papers, the Capital City Press was securing the performance of acts which were necessary to the continued existence and prosperity of the Press.

Ewell testified, and this was not disputed, that prior to 1935 he had handled bread and the New Orleans Item and Picayune and had delivered other articles to people who wanted him to bring them. That having had a disagreement with the Picayune, he made an agreement with the Press to deliver papers to be furnished by them and to build for them a route in the same territory where he had been delivering the Picayune. This agreement, like that with the other carriers, was terminable at any time. He built the route, solicited his own customers, used his own car, paying the maintenance and operation costs and the insurance premiums on it, and employed and paid his own help. He had never been given instructions as to how or when the papers would be delivered. He collected from his own customers and kept the money without remitting any part of it to the Press. During that same period he delivered bread, about 200 loaves per day, and cakes, for the most part paying for the bread on its delivery to him. With the exception of the subscriptions which were paid for in full in advance at the published rates, he fixed his own price for the paper, viz., 20¢ per week or 80¢ per month, whereas the published rates were 15¢ per week and 65¢ per month. He also had an arrangement to pick up clothes to be cleaned by the Ideal Laundry. At various times he employed Robert Neyland and Norman Fairchild to make his deliveries. He felt that the operations which he conducted constituted his own business carried on on his own initiative, independent of everybody else. He considered the route a combination route of paper and bread, that one would not make anything without the other. On the day of the accident, Ewell was not in the car, Neyland had taken his place to finish the route and had delivered both bread and paper to the last customer on the route when the accident occurred. Neyland testified that he was employed by Ewell, paid by him and instructed by him and that he received no instructions of any kind from the Press, the Bakery or the Laundry.

■ Appellees insist that all of these facts, including the listing of Ewell as an employee in the policy schedule, taken together, make out a case at least for a jury verdict as to whether Neyland was a servant of the Press in respect of driving the car, that is, one for whose acts under the doctrine of respondeat superior, the Press was liable. Appellant insists that the undisputed evidence established as a matter of law that neither Neyland nor Ewell was a servant of the Press for whose acts it was liable, but that Ewell was an independent contractor in respect of work the Press desired done, "the manner of the doing of which, including the employment, payment and control of the labor, is left entirely to him"; that he is, therefore, "an independent contractor for whose acts and omissions in the execution of such contract, the other contracting party is not liable since the doctrine of respondeat superior has no application where the employee represents the employer only as to the lawful purpose of the contract but does not represent him in the means by which that purpose is to be accomplished, and the assertion of liability is based on something done or omitted in the use of such means." Robideaux v. Hebert, 118 La. 1089, 43 So. 887, 12 L.R.A.,N.S., 632. See also in full support: American National Ins. Co. v. Denke, Tex.Com.App., 95 S.W.2d 370, 372; Marquez v. LeBlanc, La.App., 143 So. 108; Abate v. Hirdes, 9 La.App. 688, 121 So. 775; Gall v. Detroit Journal, 191 Mich. 405, 158 N.W. 36; 19 A.L.R. 1164; Skidmore v. Haggard, Mo.Sup., 110 S.W.2d 726; Bass v. Kansas City Journal Post, 347 Mo. 681, 148 S.W.2d 548; Carter Publications, Inc., v. Davis, Tex.Civ.App., 68 S.W.2d 640; Bohanon v. James McClatchy Pub. Co., 16 Cal.App.2d 188, 60 P.2d 510; American Savings Life Ins. Co. v. Riplinger, 249 Ky. 8, 60 S.W.2d 115; National Cash Register Co. v. Rider, Tex.Com.App., 24 S.W.2d 28; A. L. I. Restatement of Law of Agency,

212

page 11, §§ 2<sup>,2</sup> and 250; [3] Stockwell v. Morris, 46 Wyo. 1, 22 P.2d 189.

We think it clear that appellant is right. The principle controlling here is so clearly stated in the Robideaux case, supra, and so fully supported by the jurisprudence of Louisiana and elsewhere (see the long list of cases cited in the Denke case, supra, at pages 373-4) that a dissertation from us would serve no useful purpose. Appellees' reliance on the fact that Ewell was listed as an employee is unavailing both because under the terms of the policy and the law as settled in Louisiana, the insurer is not liable unless the insured would be, and because whether Ewell was or was not an employee is not material. What is material is what kind of employee he was. If the relationship of master and servant existed and Ewell was driving the company's automobile, or his own automobile, under an arrangement which constituted a hiring of himself and his automobile to the company as its servant, so that the company would or could control the means to be employed in, and the manner of doing, the work, and therefore might have prevented but did not prevent the act which caused the danger, the doctrine of respondeat superior [4] would apply. If, on the other hand, he was engaged merely, as the undisputed facts show here he was, to get something done which the person employing him wanted done, and the means of performing the work were left to him with no control over physical details as to the manner of performance, whether he is called agent or independent contractor, the person so contracting with him would not be liable for injuries growing out of the use of such means. The Louisiana Court of Appeals cases on which appellees rely, are not in conflict with the settled Louisiana rule. Their facts completely distinguish them from the case at bar. The motion of defendant appellant for a verdict in its favor should have been granted. The judgment is reversed and the cause is remanded for further and not inconsistent proceedings.

---

[2] "Sec. 2: Master, Servant; Independent Contractor.

"(1) A master is a principal who employs another to perform service in his affairs and who controls or has the right to control the physical conduct of the other in the performance of the service.

"(2) A servant is a person employed by a master to perform service in his affairs whose physical conduct in the performance of the service is controlled or is subject to the right of control by the master.

"(3) An independent contractor is a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking."

[3] "Sec. 250: Except as stated in Sec. 251, a principal is not liable for physical harm caused by the negligent physical conduct of an agent, who is not a servant, during the performance of the principal's business, unless the act was done in the manner directed or authorized by the principal or the result was one intended or authorized by the principal.

"Comment:

"(a) A principal employing another to achieve a result but not controlling nor having the right to control the details of his physical movements is not responsible for incidental negligence while such person is conducting the authorized transaction. Thus, the principal is not liable for the negligent physical conduct of an attorney, a broker, a factor, or a rental agent, as such. In their movements and their control of physical forces, they are in the relation of independent contractors to the principal. It is only when to the relationship of principal and agent there is added that right to control physical details as to the manner of performance which is characteristic of the relationship of master and servant, that the person in whose service the act is done becomes subject to liability for the physical conduct of the actor."

[4] Cf. Arts. 2317 and 2320, La.Rev.Civ. Code:

"2317 (2296) (N 1384). Liability as respondeat superior—Things in custody.— We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications."

"2320 (2299) (N 1384). Masters, teachers and artisans—Liability.—Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed. Teachers and artisans are answerable for the damage caused by their scholars or apprentices, while under their superintendence. In the above cases, responsibility only attaches, when the masters or employers, teachers and artisans, might have prevented the act which caused the damage, and have not done it."