REMIE MATTAN v. THE HOOVER COMPANY, a Corporation, and RONALD LAGAN, Appellants.—No. 38005.—166 S. W. (2d) 557.

Division One, October 5, 1942.

Rehearing Denied, December 1, 1942.

Motion to Transfer to Banc Overruled, December 15, 1942.

*Clay C. Rogers* and *Mosman, Rogers, Bell & Conrad* for appellant, The Hoover Company; *Louis R. Weiss* for appellant, Ronald Lagan..

508

*O. H. Swearingen, Smith H. Brandom* and *W. Raleigh Gough* for respondent.

BRADLEY, C.—Action for damages, actual and punitive, for personal injuries caused by being struck by an automobile driven by defendant Lagan, alleged servant of the corporate defendant. The jury returned a verdict for $20,000 actual damages against both defendants and judgment was entered thereon. Motion for new trial was overruled and defendants appealed.

Plaintiff was struck about 6:15 P. M., after dark, clear night, January 19, 1940, while walking across State street in Kansas City, Kansas. The cause was submitted, under the law of Kansas, upon the alleged negligent failure to equip the automobile with proper headlights, or failure to warn of the automobile's approach by sounding the horn.

510

Defendants answered separately by general denial and a plea of contributory negligence, and the defendant Hoover Company further alleged that Lagan was not its servant, as that term is defined in the law, and that if he were, he was not, at the time plaintiff was injured, on any business or mission for it. The reply put in issue the new questions raised in the answers.

Error is assigned (1) on the refusal of an instruction in the nature of a demurrer to the evidence; (2) on plaintiff's instruction No. 1; (3) on the admission of evidence; and (4) on an alleged excessive verdict.

The demurrer to the evidence raised three questions: (1) Was there substantial evidence to support the alleged negligence upon which the cause was submitted; (2) Was plaintiff guilty of contributory negligence as a matter of law? and (3) (as to defendant Hoover Company) Did the relation of master and servant exist between defendant Lagan and the Hoover Company, and if so, was Lagan, at the time of plaintiff's injury, acting within the scope of his employment?

Error is not assigned on the insufficiency of the evidence to support the negligence charged, hence the first question, under the demurrer, is: Was plaintiff guilty of contributory negligence as a matter of law?

We might say that defendant offered no evidence, and that all the witnesses were called by plaintiff.

State street, in Kansas City, Kansas, is an east and west street and, at the place where plaintiff was injured, is about 45 feet in width. Plaintiff was walking north across the street at a point about midway between 9th street on the east and 10th street on the west. The street was covered with ice and snow, and a snow plow had piled snow and ice in the center of the street. On either side of the pile in the center were vehicle tracks or ruts in the snow and ice made by the east and west bound traffic. There were street lights on State street at 9th and 10th streets, but there were no street lights on State between 9th and 10th. Plaintiff was going to a house, No. 906, on the north side of State street in front of which house there was, at the time, a parked automobile on the street. Defendant Lagan, driving his Chevrolet sedan, approached from the east and struck plaintiff, in the westbound traffic lane, with the left fender.

Plaintiff testified that he looked both east and west when he started across the street, and that there was no "automobile in sight"; that "pretty near the center" he looked both ways again "and there was still no automobile in sight"; that after looking the second time he did not look again, but "started on across", looking where he was walking; "it was pretty slick and icy; you had to watch your step", and "the first thing I knew there was a man with an automobile in front of me before I even realized what was there"; that he neither

heard an automobile nor saw any automobile light from the time he left the south curb until he was struck and that he heard no automobile horn or warning of any kind; that he was hit and "that is all I remembered for a while."

Mrs. Joe Karnosky testified, by deposition, that plaintiff was struck about 20 feet west of 906 State street; that at the time, she "was coming down the steps" at 906, and saw plaintiff "struck by an automobile"; ▮ that she heard no horn; that she went to plaintiff in the street and that when she "got up to the car" the lights were out.

Joseph Novak, a police officer, testified that he went to the place where plaintiff was struck and talked to defendant Lagan; that Lagan said "he was driving west on State avenue about twenty or twenty-five miles an hour. He said an object showed up and he tried to prevent hitting it after he seen it was a man. He cut to the north curb, and he struck the man with the left front fender, breaking the left headlight out of the car."

Plaintiff introduced a part of the deposition of defendant Lagan, who testified that his business was selling Hoover sweepers; that his territory was "Greater Kansas City" (Jackson County, Missouri and Wyandotte County, Kansas); that on the day of plaintiff's injury and about 6:15 P. M., he (Lagan) was driving his automobile west on State street with which street he was familiar; that it was very dark, and the color of his car was black; that he came into State street at 8th street; that State street is straight from 8th street to the place where plaintiff was struck; that there was no traffic, at the time and place, on the street, except his car; that he just got a glimpse of plaintiff before the impact.

Lagan further testified that at the time his car struck plaintiff he (Lagan) was driving about 25 miles per hour and was "pretty well toward the center of the street because of the old car parked on the side"; that he applied the brakes just as soon as he saw plaintiff, and turned to the right; "that it was dark; couldn't see anything"; that his lights were in good condition and were on at the time.

Sec. 57, Laws of Kansas, 1937, p. 443, provides: "(a) Every pedestrian crossing a roadway at a point other than within a marked crosswalk or within an unmarked crosswalk at an intersection shall yield the right of way to all vehicles upon the roadway. . . . (d) Notwithstanding the provisions of this section every driver of a vehicle shall exercise due care to avoid colliding with any pedestrian upon any roadway, and shall give warning by sounding the horn when necessary. . . ."

As supporting the contention that, under the law of Kansas, plaintiff was guilty of contributory negligence as a matter of law, defendants rely on Buchhein v. Atchison, Topeka & Santa Fe Rv. Co., 147 Kan. 192, 75 Pac. (2d) 280; Earhart v. Tretbar, 148 Kan. 42, 80

Pac. (2d) 4; Crowder v. Williams, 116 Kan. 241, 226 Pac. 774; Hanaberry v. Erhardt et al., 110 Kan. 715, 205 Pac. 352.

The trial court sustained a demurrer to the evidence in the Buchhein case, and the plaintiff appealed. The court held that "a mature person who attempts to cross a railroad track without taking any precautions for his own safety, while riding in an automobile with another who is driving, cannot recover damages from the railroad company for injuries sustained in a collision with a train on the track, when by looking he could have seen the approaching train in time to have warned the driver of the danger."

In the Buchhein case it was daytime; the plaintiff knew that a train was due, and "had nothing to do except watch for a train." In the present case, it was in the nighttime, and defendant, Lagan, said that "it was dark; couldn't see anything"; and his car was black. Also, there was snow and ice on the street and plaintiff was compelled to give some attention to his walking; and there was evidence tending to show that Lagan's lights were not on. We do not think that the Buchhein case supports the contention that plaintiff was guilty of contributory negligence as a matter of law. It will not be necessary to review the other cases cited. They do not support the contention that plaintiff was guilty of contributory negligence as a matter of law. Such question was for the jury.

Was the relation between Lagan and the Hoover Company such as to make the Hoover Company liable for Lagan's negligence when on duty? In other words, was Lagan a servant or an independent contractor? The Hoover Company and Lagan entered into a written contract on November 1, 1937. The contract was captioned "Hoover Field Salesman's Agreement", and Lagan is referred to as the Salesman and the Hoover Company as the Company. The contract recited that the Company's district manager appointed Lagan "as an authorized Hoover salesman . . . to promote and secure the sale of Hoover Electric Cleaners and Cleaning Equipment at retail." By the contract the salesman agreed:

(1) To sell Hoover products only in the territory assigned to him and be entitled to follow other leads obtained by him from individuals originally contacted by him through his canvassing work, provided copies of such leads were filed in the Hoover office; (2) to be responsible for all money entrusted to him relating to the sale of Hoover products; (3) to allow 10% on his net commissions on all Hoover products sold to accumulate in the hands of the Company until a reserve fund of $100 was accumulated, which fund was for the purpose of protecting the Company against any possible losses incurred through acts of the salesman; (4) to permit the Company to charge back to his account all commissions paid or credited on Hoover products that were returned for any cause within four months after date of original sale; (5) to be responsible for all Hoover prod-

ucts delivered to him; (6) to turn over to the Hoover Company all used electric cleaners traded in on the sale of new Hoover products; (7) to pay all his own expenses and not sign the Company's name or the dealer's name to any contract or agreement or assume any liability in the name of the Company or dealer or represent them as liable for any obligation incurred. All traded in cleaners were the property of the Hoover Company, and the salesman agreed to strictly adhere to such policy—'' otherwise he will be summarily dismissed.''

The contract recites that in consideration of the covenants on the part of the salesman, the Company agreed:

(1) To furnish the salesman, on consignment, cleaners for his use in demonstrating, and to furnish a demonstration portfolio, and pay him a commission of 18% of the cash retail price on all Hoover products sold except sales to commercial users on which 12% commission was paid; in case of sales made on Government contracts and delivered by the salesman to Government institutions located within his territory he received one-half of the regular commissions; (2) to remit to the salesman each week all sales commissions earned for the preceding week as shown on his weekly sales report, ''deducting therefrom the commission on any Hoover products reverted within four months after date of original sale, as well as amounts necessary for the building of the salesman's reserve fund.'' The contract goes on to provide for a bonus of 10, 20, and 33⅓% on certain sales volumes. And the contract provided that it could be cancelled ''at any time by either party without cause.''

The ''dealer'' referred to in the contract is one who takes over a contract of sale. He investigates the credit rating of a customer purchasing on time, and if he approves the sale, the contract with the purchaser shows the dealer as the seller.

The Hoover Company's main office is at North Canton, Ohio, and, among its branch offices, is the branch office in Kansas City, Missouri. At the Kansas City office there were an office manager, a district manager, a district clerk, supervisors, and other officers.

One wanting to become a salesman signed an application for an interview and, if approved, he attends the training school conducted by the Company. William Austin, who assisted in training salesmen, testified that the training consisted of ''a basic knowledge about rugs, carpets, dirt, cleaners, and cleaning principles, and it gives the men a track to run on when they go in a home relative to selling a piece of Hoover merchandise. . . . Q. *Are they directed how to demonstrate the Hoover in the home?* . . . A. *We have what we call a base demonstration that we have built up over a period of time that we feel is the proper way to show our merchandise to the best advantage to the salesmen and we teach him that procedure.* . . . Q. *At this school do you have any standard to make?* A. *Well, at the conclusion of the school the men that have been in attendance are*

*expected to go over the things that they have learned in the school, yes.* Not exactly a test, but a review and all."

A salesman was required to carry along with him at least one sweeper for demonstration purposes. He also had blank contracts, literature, etc. All these were furnished by the Company. The operating procedure was about as follows:

The salesmen call on prospective customers at their homes and, when permitted, demonstrate the sweeper, and make a sale if they can, and demonstrations are frequently at night so the head of the house may be present. If a sale is made, the salesman has the customer sign a conditional sales contract in quadruplicate. The customer and the salesman each retain a copy, and one copy goes to the dealer ▮▮▮▮ and one to the district office of the Company. The salesman who makes a sale gets the sweeper from the stock room of the district or branch office or from the dealer and delivers it. All sales are reported to the district office and a record of all sales is made and kept at this office.

The Company maintains an educational department at which the salesmen regularly receive instruction on salesmanship. There are supervisors, and each supervisor has charge of a certain number of salesmen, and get what is termed an override commission on the sales made by those in his group, and the supervisor's pay depends on the sales made by the salesman in his group.

Lagan's supervisor was Edward Y. Treffinger, who testified that all the salesmen went on personal leads; that he told them that *the best way to get a lead was "to ring door bells till they got a lead"*; that such *"was the best way to get business"*; that he met the salesmen in his group "morning, afternoon and evening"; that Lagan attended these meetings "most of the time"; that at these meetings there was an "activity check"; that the Company furnished the salesmen cards upon which he noted his activities, such as the number of contacts made, demonstrations made, etc., and that at the meetings these cards were checked. Treffinger further testified that if calls came to the store from prospective customers these calls were "rotated among the salesmen", and that when a salesman was given a call *he was expected to attend to it*; that "if a man is selling ten or twelve Hoovers a week he can do anything he wants to"; that if they do not make sales he told them to turn in their equipment; *that the use of a salesman's car was "not necessarily" included in his compensation*; that his (Treffinger's) compensation depended solely on the amount of sales made by salesmen in his group.

On cross-examination Treffinger testified Lagan's written contract "governed his relations with the Company"; that his (Treffinger's) duties were confined to assisting in the sale of the Hoover sweepers and seeing that the salesmen complied with their contract; that he never gave Lagan "any direction or order respecting the use of his

automobile''; that he nor the Company, so far as he knew, was not "interested in any of the activities of the salesmen except that his conduct be honorable and that he sell Hoover sweepers''; that he was not "interested in any manner or method" that a salesman might choose "to demonstrate or sell a sweeper''; that he did not, in any way, "restrict the hours that Lagan worked''; that he did not require Lagan to attend meetings. Treffinger further testified that a man might be a barber or work at an automobile plant, for example, "and sell Hoovers under a contract similar'' to Lagan's contract; that the Company had two such salesmen at the time of the trial.

Ruby Mott, a switchboard operator for the Hoover Company for the year 1939, testified that she heard supervisors *give instructions to the salesmen as to what particular part of their districts would be worked; that she heard supervisors at different times say where the salesmen under them were to canvass*; also make appointments to meet them. "I was also given at different times instructions to tell different salesmen *that they were to go on a certain demonstration,* or they were to meet them (supervisors) at definite places they so stated at that time.''

J. H. Jones, a former supervisor, testified to the same effect as did Treffinger as to what he, as supervisor, did. Jones said that if a man had a definite place to go, he told him to go ahead. "*If not, I told him to get on some certain street and start ringing door bells till he got in.*'' Also, Jones said that all salesmen were required to attend a meeting of salesmen held on each Monday "at the Hoover office in Kansas City, Missouri.''

Roger W. Kelly, the Hoover Company's branch office manager in Kansas City, and with the Company for 25 years, testified, on cross-examination: "Q. Now, do you have any authority or control whatever over any salesmen? A. No. Q. Or did you in January, 1940? A. No, sir, I never had. Q. Never have had? A. No, sir. Q. *Did you undertake to exercise any right to order or direct the salesmen to do anything? A. No, sir, I couldn't. Q. That was in some department other than yours? A. Yes, sir.*''

There was no specific requirement that a salesman use an automobile in canvassing, but in some advertisements of the Company for salesmen it was stated that prospective salesmen "*must have cars*'' and a prospective salesman was asked *if he had an automobile.* A salesman had to carry ▮▮▮ along his supplies, the blank contracts, literature, etc., and the demonstrator sweeper, the weight of which was 16 to 20 pounds. The machine and the tools were packed in one carton and the handle was in another and separate carton. The handle carton was 4 inches in width, 1¼ inches thick and 40 or 42 inches in length. The machine and tools carton was about 16 inches in depth, 20 inches in width, and about 30 inches long. Indeed it would have been hard going without a car. (All italics are ours.)

"To obtain the shield of an independent contractor, the owner or proprietor must, first, select 'a competent and fit person; engaged in an independent calling; second, the work committed to him must be neither 'attended with danger to others' nor unlawful; third, the contractor must be allowed to do the work according to his own methods and only subject to control by the owner 'as to the results of his work.' Without the concurrence of each and all of these conditions, the condition of independent contractor cannot legally exist. The decisions in this State have not only affirmed this doctrine by the adoption of the foregoing definition, but they have held, on the various occasions when it became necessary to consider the effect of the absence of any one of these legal requirements that the relationship of owner and independent contractor was thereby prevented, and that the owner was left responsible just as if he did the work on his own behalf." Salmon v. Kansas City, 241 Mo. 14, 1. c. 57, 145 S. W. 16, 39 L. R. A. (N. S.) 328.

Section 2, Restatement of the Law of Agency, defines master, servant, and independent contractor as follows:

"A master is a principal who employs another to perform service in his affairs and who controls or has the right to control the physical conduct of the other in the performance of the service."

"A servant is a person employed by a master to perform service in his affairs whose physical conduct in the performance of the service is controlled or is subject to the right to control by the master."

"An independent contractor is a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking."

See also, Barnes v. Real Silk Hosiery Mills et al., 341 Mo. 563, 108 S. W. (2d) 58, 1. c. 61; Skidmore v. Haggard et al., 341 Mo. 837, 110 S. W. (2d) 726, 1. c. 729; Bass et ux. v. Kansas City Journal Post Co., 347 Mo. 681, 148 S. W. (2d) 548, 552.

The principal factors to be considered in answering the question—servant or independent contractor? are given in Sec. 220 of the Restatement as follows:

"(a) The extent of control which, by the agreement, the master may exercise over the details of the work;

"(b) whether or not the one employed is engaged in a distinct occupation or business;

"(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

"(d) the skill required in the particular occupation;

"(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

"(f) the length of time for which the person is employed;

"(g) the method of payment, whether by the time or by the job;

"(h) whether or not the work is a part of the regular business of the employer; and

"(i) whether or not the parties believe they. are creating the relationship of master and servant."

It is pointed out in the Bass case, supra [148 S. W. (2d) l. c. 552] that "no one of these various factors (quoted, supra, from Restatement) is in itself controlling, but each, in accordance with the circumstances of the given case will be given weight."

Plaintiff concedes that the contract between Lagan and the Hoover Company "does not directly touch upon the vital question of whether or not the Company reserves the right to control or direct Lagan in the methods employed by him in making sales", but plaintiff says that the evidence as to the modus operandi makes the question—servant or independent contractor? one of fact.

As supporting the contention that Lagan was an independent contractor the Hoover Company, among other cases, cites Dohner v. Winfield Wholesale Gro. Co. et al., 116 Kan. 237, 226 Pac. 767; Hurla v. Capper Publications, Inc., et al., 149 Kan. 369, 87 Pac. (2d) 552; Redfield v. Chelsea Coal Co.. 136 Kan. 588, 16 Pac. 475; Mc-Craner v. Nunn et al., 129 Kan. 802, 284 Pac. 603; Houdek v. Gloyd et al.. 152 Kan. 789, 107 Pac. (2d) 751; Skidmore v. Haggard et al., 341 Mo. 837, 110 S. W. (2d) 726; Snowwhite v. Metropolitan Life Ins. Co., 344 Mo. 705, 127 S. W. (2d) 718; Vert v. Metropolitan Life Ins. Co. et al., 342 Mo. 629, 117 S. W. (2d) 252; Barnes v. Real Silk Hosiery Mills, 341 Mo 563, 108 S. W. (2d) 58.

The present case is more like Barnes v. Real Silk Hosiery Mills, supra, than any of the others. However, the contract in that case specifically provided [108 S. W. (2d) l. c. 60] that Ferguson, the salesman, should "at all times be free from the control or direction of the Mills as to the time when he" should solicit orders, and there was no evidence that the Mills departed from such provision. Also, there was no evidence in that case tending to so strongly indicate, as in the present case, that a salesman was *expected* to follow instructions as to *how* to sell. We have, in the present case, set out the evidence pertaining to control of a salesman as to time and place of soliciting and the manner of demonstration. The Hoover Company, in the brief, says that the contract *appoints* Lagan as "an authorized Hoover salesman", and then says that automobile companies appoint *thousands* as "authorized sales agents", but that in no case has such agent "been thought to be a servant." Generally, an automobile sales agent may take title to "traded in cars", and engage in the independent business of selling such, but not so with Lagan. His contract specifically prohibited him from taking title to "traded in cleaners", and thus prohibited him from engaging in any independent business of selling such. And this contract provision we regard as

important in determining the relation between Lagan and the Hoover Company.

It could serve no useful purpose to review all these cases. They deal with the subject of master and servant, and independent contractor, and in each case, where the question was for decision, it was held that the relation of master and servant did not exist; that the duty of the alleged servant was merely to bring about a contractual relation between his employer and third persons, and that the employer had no right of control over the alleged servant as to the manner in which he proceeded to bring about such relation.

But in the present case we do not think it can be fairly said that the evidence above italicized, considered with all the other evidence, does not raise an issue of fact on the question as to whether the Hoover Company controlled or had the right to control a salesman as to the methods he employed in making or endeavoring to make a sale. William Austin, who assisted in training salesmen, said that the Hoover Company had a "base demonstration that we have built up over a period of time, that we feel is the proper way to show our merchandise to the salesman and we teach him that procedure." And it will be noted that Austin said that the salesmen were "expected to go over the things that they have learned in the school." Go over them where? Clearly, the inference is in the homes where they made demonstrations of the sweeper. And from the evidence of Ruby Mott, a jury could find that the supervisors, on occasions, directed salesmen *where* to canvass or where to go to make a demonstration. And from the evidence of Treffinger and Jones, they, on occasions, directed a salesman to go on certain streets and ring door bells till they got in.

Under the most favorable evidence rule which, of course, is applicable in support of the verdict, we think that the question of servant or independent contractor? was for the jury, and we so rule.

■ Was Lagan, at the time of plaintiff's injury, acting within the scope of his employment? Plaintiff contends that the evidence raised an issue of fact as to whether Lagan was, at the time, on his way to demonstrate a sweeper.

The day of the week plaintiff was injured was Friday. On that day, about 2 P. M., Guy A. Patterson, who resided at 1511 Waverly, Kansas City, Kansas, and who had known Lagan for about two years, called the Hoover office in Kansas City, Missouri, "and told them to send a man over"; that he "was interested in a Hoover sweeper", and that "the party who answered that call promised to send a salesman that evening", and that "around six o'clock in the evening was fixed for the salesman to be" at his place. No one came on Friday, and Patterson called again Saturday, but what was said as to why no salesman came on Friday was excluded. ■ Lagan went to Patterson's home on Monday and demonstrated a sweeper.

Lagan's home was at 1516 State street, some six blocks west of the place where plaintiff was struck. Lagan testified that when his

car struck plaintiff, he, Lagan, was "going home to dinner. I was going home to eat supper at the time"; that he had an engagement to demonstrate a sweeper that evening, but that he did not intend to fill the engagement until "after I had dinner." Plaintiff says that Patterson's house was "on the same route" that Lagan's was from the place where plaintiff was struck. Such could be so, because Waverly is west and north of 906 State street.

Trenmor Demoss, policeman, was at the place where plaintiff was struck a few minutes thereafter and testified that Lagan said that at the time plaintiff was struck "he (Lagan) was on his way to make a demonstration."

Irene Williams resided, at the time plaintiff was struck, at 906 State street. She testified that, shortly after the injury, Lagan was in her house and said "he was making a demonstration that night"; that "he said it was Peterson or Patterson—some such name as that. . . . Well, he said that he wanted to go on, and he told the police if he was going to arrest him he wanted to make bond because he was going to demonstrate a Hoover yet that evening."

In Snowwhite v. Metropolitan Life Ins. Co. et al., 344 Mo. 705, 127 S. W. (2d) 718, it was contended by the defendant insurance company that Nushy, a codefendant, was not on any mission for the company at the time plaintiff, in that case, was struck by the automobile driven by Nushy. A question there similar to the question here was indicated thus: "Will the fact that Nushy made a collection in his debit about two hours after plaintiff's injury, support an inference that he, at time of her injury, intended to make such collection, that is, was such collection one of the purposes of Nushy's trip?" It was held that such fact would not support such inference. But in the present case, there is positive evidence, the competency of which is ruled presently, that defendant Lagan was at the very moment of plaintiff's injury on his way to fill an appointment to demonstrate a sweeper, and make a sale if he could, and whether he was or not was a question for the jury.

Defendant Hoover Company challenges the competency of the evidence of Demoss and Williams as to what Lagan said about where he was going at the time plaintiff was struck. The contention is made that such evidence was hearsay as to the Hoover Company. In Shelton v. Wolf Cheese Co., 338 Mo. 1129, 93 S. W. (2d) 947, l. c. 952, the court said:

"Whatever is said by an employee or agent of a private corporation in respect to and in the course of any transaction, or in connection with and accompanying and relating to the performance of any act, in which he is then engaged, 'or, in the language of the old writers, dum fervet opus,' while he, acting within the scope of his employment or authority, is carrying on or transacting the business, or doing the work, of his master or principal, is admissible in evidence,

as an admission or declaration, against the principal (the Latin phrase, supra, is translated 'while the work glows', or 'in the heat of action'); but 'declarations' or admissions 'of an agent with respect to an act or transaction, made after the occurrence of the act or the completion of the transaction, are not provable against the principal. This rule is the basis for the exclusion of evidence of declarations of an agent that he had previously bound his principal by a contract, as well as for the exclusion of evidence of the admissions of a servant, whose alleged negligence caused injury to another, *made long after the accident* (italics ours). Such statements are merely hearsay and like those of any other person, and cannot affect his principal. A rule that would allow an agent, after a transaction is closed, to admit away the rights of his principal, would be too dangerous to be tolerated.' " Many authorities are cited.

What Lagan said to Demoss and Williams was not "long after the accident", but in a very short time thereafter. However, plaintiff concedes that, in the situation, what Lagan said to Demoss and Williams is "not a part of the res gestae in the sense that it was a spontaneous declaration", but plaintiff contends that such evidence was competent to show the state of Lagan's mind at the time. After the accident, Lagan first went to see his supervisor to make a report of the accident, and plaintiff, in the brief, says:

"The evidence indicates that, whatever his intentions ▅ were, they were not followed out, for the evidence indicates that he did not go on after the accident and eat his supper, and the evidence also indicates that he did not keep his appointment with Patterson that evening. So the point at issue is: What was Lagan's state of mind; what were his intentions? Those intentions rested solely in the mind and heart of Lagan, and the only way they could be proved (apart from his own present statement) was by some outward manifestation by him of his intentions, by deed or word. Since there was no manifestation by deed—he did not fulfill either one of his possible purposes —the only evidence left was proof of his manifestation by words."

In 31 C. J. S., Sec. 256, p. 1007, is stated: "Declarations may be relevant evidence as to the existence of a particular intent or intention in the mind of the declarant. Such declarations are admissible if, and not unless, the existence of the particular mental state at the time to which the declarations relate is a relevant fact; and are to be excluded where the intent does not affect the legal result of the transaction. The declarations are not direct evidence of the facts asserted, but merely circumstantial evidence as to the existence of some relevant and material fact. Such evidence is admissible, not as a part of the res gestae, but as a fact relevant to a fact in issue."

Lagan had in his car at the time plaintiff was struck, a demonstrator sweeper, blank contracts, etc.; was on State street 6 blocks

east of his home and east and south of Patterson's. He testified that he was going home for supper, and it is conceded that such was competent. We do not think that the wholesome law which prohibits an agent from admitting "away the rights of his principal" will be violated by ruling that the evidence of Demoss and Williams as to what Lagan said as to where he was going was competent and we so rule.

Complaint is also made by the Hoover Company on the admission of the evidence of Patterson as to what was said to him when he called up the Hoover Company. The general rule is "that statements made by a person answering a telephone call to a place of business, though no personal identification is made of such person, in the course of negotiations relating to and in the transaction of the ordinary business of the company are admissible, the presumption being that such person is authorized to transact such business for the company . . . but the rule goes no farther." Shelton v. Wolf Cheese Co., supra [93 S. W. (2d) l. c. 953]. It was held in the Wolf case that the statement of the person answering the telephone that he was the manager was not sufficient to establish that such person was the manager because the authority of an agent cannot be established by his own declarations. We do not think that the admission of Patterson's evidence was error.

Lagan's alleged negligence was submitted in instruction No. 1. It is stated in the brief that "the particular vice inherent in this instruction is that while it submits two distinct acts of negligence in the alternative, namely, negligently failing to have the automobile equipped with lights required by the ordinance, and negligently failing to sound a warning, it did not submit to the jury or require the jury to find any facts from which it could be said in what way the alleged negligent failure to have the automobile equipped with lights directly and proximately caused the collision."

The instruction set out what the law required as to lights, and then told the jury that if they found that Lagan's car "was not so equipped", and that such failure was negligence, and that such negligence "was the direct cause of plaintiff being struck", then to find for plaintiff. And the instruction went on, and in the alternative, to tell the jury that if they found that Lagan "did not give audible warning with his horn", and that such failure was negligence, and that "as a direct cause thereof plaintiff was struck and injured", then to find for plaintiff. We do not think that there is any merit in the assignment on instruction No. 1.

Was the verdict excessive? Dr. H. L. Regier testified that he saw plaintiff at the hospital about an hour after he was injured; that he was then "in considerable shock—a little dazed"; that he was treated that night for shock and that next morning X-rays were made, which showed that the left leg was "badly crushed; there were six

distinct fractures'' of the left leg and three of the right, and that the left arm was broken at the wrist; that plaintiff had many cuts over the body and scalp.

On the condition of plaintiff's left leg at the time of the trial, 15½ months after the injury, Dr. Regier said that "the disability consists in that he has a great deal of swelling in there when he gets up on the leg or lets it hang down, which is the result of an inflammation of the vessels which occurred at that time. Then he has a disturbance in his knee joint and ankle joint for the simple reason that there is a great deal of angulation at the site of the fractures. By that I mean bending. So when he walks it disturbs the axis of the joints. The joints have to be in line to bear the weight, and that is disturbed and that is the reason why I think he has so much pain at the present time. Q. Is that a permanent condition? A. Well, it isn't getting any better—it evidently doesn't.''

Dr. Regier further testified that he gave plaintiff three or four general anesthetics; that he was not certain that other operations would not yet be required; that plaintiff was disabled fifty percent. "Q. He (plaintiff) was at the time, the evidence shows here, a plumber—pipefitter—and he had to handle wrenches. I believe that is the testimony. Now, will he be able to ever, in your opinion, in the future, to take up that work and carry it on like he did prior to the time he was injured? A. For any work that he attempts to do that requires him standing and walking on his leg, he is totally—I mean his partial permanent disability is fifty percent. . . . Q. Do you remember how long it was necessary to keep that knee and ankle wired as you did in this treatment? A. How long it was, or will he? Q. You said it was wired or bolted. A. Well, sir, I changed the cast—we had it in that wire apparatus where it was bored through the bone about eight weeks. Then I tried to keep it without traction in another cast. We had a cast on about three or four months, constantly.''

In plaintiff's brief, his injuries, pain, etc. are fairly summarized as follows: Plaintiff's left leg was fractured in six places—compound fractures. "Although the testimony is that a good result was obtained with the right leg, there is a big lump there and a blood vessel or nerve (right leg) that gave plaintiff a lot of trouble at the time of trial. . . . The left leg is very much crooked; it had a swelling in it at the time of trial. . . . A piece of chipped bone had come out just two or three weeks before the trial. Plaintiff has to wear slippers instead of shoes. He does not have the strength in it and does very little walking. His legs ache, plaintiff suffers every day with them. He has pains and cramps at night. It affects his sleep.''

Plaintiff was a pipefitter, 47 years of age at the time of injury; was employed and was receiving $1.05 per hour; worked 36 hours per week and therefore received $37.80 per week. He was injured Jan-

uary 19, 1940; went to the hospital at time of injury; left hospital June 27, and went back to work October 16, 1940, "as a watchman— a job sitting down", at 77 cents per hour. His employer paid his regular weekly wage for the six months immediately following injury.

"It is generally held in state courts that 'where future payments are to be anticipated and capitalized in a verdict, the plaintiff is entitled to no more than their present worth.' " Gill v. Baltimore & Ohio R. Co., 302 Mo. 317, 259 S. W. 93, l. c. 97; Mickel v. Thompson, 348 Mo. 991, 156 S. W. (2d) 721, l. c. 728. At $37.80 per week plaintiff's annual earnings, prior to injury, were $1965.60. After he went back to work about 9 months after injury, he received 77 cents per hour, and at 36 hours per week his weekly earnings were $27.72, or annual earnings of $1441.44. Under Sec. 3522, R. S. 1939, the present worth of an annual income of $1965 over the period of plaintiff's expectancy at age 47 was $21,917.61, and the present worth of an annual income of $1441 over the period of his expectancy was $16,-072.91. The difference is $5844.70. We do not take into account in this calculation that plaintiff was paid his regular wage of $37.80 per week for the first six months after injury. The difference, had we taken the omitted factor into consideration, would not be great, and the difference of $5844.70 is substantially correct.

"It must not be overlooked that the table in Sec. 3522 is based upon annuities of a sum certain and for a definite duration, and requiring no effort upon the part of the recipient, while future earnings of plaintiff could not be definite in amount or duration, besides the fact that such earnings, if plaintiff continued to receive them for his expectancy, would require work and labor. Such, we think, ▮▮▮▮ should not be overlooked in dealing with the vexing question of excessive damages. Also, there is the rule that 'when the facts as to the injuries inflicted and losses sustained are similar, though never identical, there should be a reasonable uniformity as to the amount of verdicts and judgments in the various cases.' " Mickel v. Thompson, supra [158 S. W. (2d) l. c. 728].

"One of the most difficult tasks to be performed by an appellate court is the determination of the justness of a verdict (amount) in an action for a tort." Span v. Jackson, Walker Coal & Mining Co., 322 Mo. 158, 16 S. W. (2d) 190, l. c. 203.

In Christopher v. Chicago, B. & Q. R. Co. et al. (Mo. Sup.), 55 S. W. (2d) 449, the plaintiff was 49 years of age and earned $60 per week. His injuries are stated as follows [55 S. W. (2d) l. c. 452]: "As a result of being thrown from his truck by the collision, plaintiff sustained an oblique and impacted fracture of the right femur just above the knee. An examination by X-rays and otherwise, made just before the trial and something over two years after the injury, showed that the right leg was from two to three inches shorter than

the left; that the knee joint was thickened and its motion limited to the extent of 50 percent; and that the bones of the leg were out of alignment causing the toes to turn inward. Plaintiff walked with a limp, suffered occasional twinges of pain in the knee, and tired easily from standing or walking. This condition, which prevents plaintiff from doing manual labor requiring heavy lifting or being continuously on his feet for any considerable length of time, is permanent." And, it is stated that the plaintiff in that case had sustained a loss of $5,000 in earnings at the time of the trial. It was held that a verdict of $15,000 was not excessive.

We are of the opinion that the rule as to uniformity of verdict amount would be better served if the present verdict of $20,000 be reduced to $15,000. Therefore, if plaintiff will file here, within ten days after the filing of this opinion, a remittitur of $5,000, the judgment will be affirmed for $15,000 as of the date of its rendition, otherwise the judgment will be reversed and the cause remanded. It is so ordered. *Hyde* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur except *Hays, J.,* absent.

### ON MOTION FOR REHEARING.

BRADLEY, C.—It is contended in the motion that in ruling the question as to the relation existing between defendants we "failed to apply the law of Kansas" where the cause of action accrued, and that in ruling the question on the scope of employment we gave effect to evidence not admitted against defendant Hoover Company. On the relation question, servant or independent contractor? it is not certain that the law of Kansas is applicable. It was not pleaded that the Lagan contract was a Kansas contract, and as stated in the opinion, the Hoover Company's main office is at North Canton, Ohio, and at the time of the execution of the contract a branch office was maintained in Kansas City, Missouri, and when the contract was executed, Lagan was a resident of Kansas City, Missouri, and the inference could be drawn that the contract was executed in Kansas City, Missouri. However, the point is not important, because there is no Kansas case that would, under the facts, justify the conclusion that Lagan, as a matter of law, was an independent contractor as to the Hoover Company.

In the opinion we referred to the cases, in Kansas and Missouri, relied upon by the Hoover Company on the question of servant or independent contractor. Among these is Dohner v. Winfield Wholesale Gro. Co. et al., 116 Kan. 237, 226 Pac. 767, which is stressed in the motion.

In the Dohner case the facts are these: The suit was against the grocery company and Harris, its travelling salesman, for damages on account of personal injuries resulting from being struck by a car driven by Harris on his first trip for the grocery company. Plaintiff obtained a judgment against both defendants. The trial court granted the grocery company a new trial on the theory that Harris was, as to the grocery company, an independent contractor, and the plaintiff appealed. The grocery company's place of business was at Wichita. It made an oral contract with Harris to canvass a certain territory covering 16 or 17 towns. Harris was "to take orders for goods and to collect money for goods which had been delivered"; his minimum pay was $175 per month, but the pay would increase in the event of certain sales volume. Harris was to furnish his own transportation and pay his expenses. "He was at liberty to select any manner of transportation, and any routes and times of visiting the different towns that he chose; the only requirement being that he should call on the trade of the whole territory once each week." The grocery company furnished Harris with samples and gave him a list of the merchants in the territory who purchased the preceding week. It was held, as a matter of law, that Harris was an independent contractor. The gist of the ruling is stated in headnote 2 [226 Pac. 767] as follows:

"A salesman who operates an automobile at his own expense, whose movements are not controlled by his employer, except that he shall make his territory once each week, is, with respect to the operation of the car, an independent contractor, so that his employer is not answerable for injuries caused by his negligent operation of the car."

Manifestly the Dohner case is distinguishable on the facts from the present case. In the Dohner case the salesman was not required to attend a school of instruction; was not required to keep an activity card, and be called up four times a day to report on his activities. He had no supervisor who told him "to ring the door bells" of the merchants in his territory until he got a hearing. There was no "base demonstration" drilled into him as to how to present his wares to a prospective customer. It will not be necessary to review the other Kansas cases cited.

In the motion, the contention is made that the evidence of the witnesses Demoss and Williams, as to what defendant Lagan said as to where he was going at the time plaintiff was struck, was not admitted against defendant Hoover Company, and that such should not have been considered at all as to said company. It is true that the trial court made some remarks about such evidence being hearsay as to defendant Hoover Company, but the jury was not told to disregard such evidence, so far as concerned the Hoover Company, and the evidence was, in effect, admitted for all purposes. And not only this, but, in the Hoover Company's separate motion for a new trial,

complaint was made that "the court erred in permitting the witness Demoss to relate an alleged conversation which he claimed to have had with the defendant Lagan after the injury to the plaintiff, in which conversation it is claimed that the defendant Lagan stated to the witness Demoss that he, Lagan, was on his way to make a demonstration of a Hoover sweeper", and that "the court erred in permitting the witness Mrs. Williams to relate an alleged conversation which she claimed to have had with the defendant Lagan after the injury to the plaintiff, in which conversation it is claimed that the defendant Lagan stated to the witness Mrs. Williams that he, Lagan, was on his way to make a demonstration of a Hoover sweeper."

And these assignments were among the assignments of error in the brief here, and in discussing these assignments in the brief, it is said: "The only purpose for which that hearsay evidence was admitted was an attempt to fasten liability upon The Hoover Company." In the situation we can hardly be blamed for assuming that the evidence mentioned was *admitted* against the Hoover Company. Defendant Hoover Company, in the motion, reargues the competency of the evidence of Demoss and Williams.

We ruled that question in the opinion, showing that Lagan's declarations were in harmony with and a constituent part of other circumstantial evidence warranting the same inference. Also, the inference could be drawn that the statements Lagan made about being "on his way to make a demonstration", and that he wanted to make bond "because he was going to demonstrate a Hoover sweeper yet that evening" were made in connection with the performance of an act for his employer and would fall under what we may term the rule of dum fervet opus, as explained in Shelton v. Wolf Cheese Company, 338 Mo. 1129, 93 S. W. (2d) 947, l. c. 952, which case we cite and quote in the original opinion. And we might say that, under the facts, it would be for the jury to say *when* Lagan intended to make the demonstration, that is, whether before or after he had supper.

The Hoover Company, in the motion, says that what Lagan said to witness Demoss about being on "his way to make a demonstration" was not on the night of plaintiff's injury, but was on a later date. It will not be necessary to set out the evidence on this point. It is sufficient to say that the inference could be drawn from the evidence that such was said on the night of plaintiff's injury and shortly thereafter, as stated in the opinion.

Counsel, in the motion, say that no such inference, as stated in the opinion, can be drawn from the evidence of witness Austin. It is true that witness Austin said that "at the conclusion of the school" the men in attendance were "expected to go over the things they have learned in the school" as "a review and all." But would that be the *last* time the salesmen would *go over* what they were taught? Would they be expected to promptly forget *at* the close of school, all

that they were taught? Might not a jury draw the inference stated? Clearly we think so.

The motion for rehearing should be overruled, and it is so ordered. *Hyde* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur except *Hays, J.,* absent.