John H. LAWRENCE, Employee,
(Claimant) Appellant,

v.

WILLIAM GEBHARDT, JR., & SON,
Employers,

Hartford Accident and Indemnity Company, Insurer,

Bridlespur Hunt Club, Employer,

St. Paul Mercury Indemnity Company, Insurer, (Defendants) Respondents.

No. 30007.

St. Louis Court of Appeals. Missouri.

March 4, 1958.

Motion for Rehearing or to Transfer to Supreme Court Denied April 4, 1958.

William R. Hirsch, St. Louis, for appellant.

Moser, Marsalek, Carpenter, Cleary, Jaeckel & Hamilton, John S. Marsalek, St. Louis, for William Gebhardt, Jr. & Son, and Hartford Acc. & Ind. Co.

Albert I. Graff, Malcolm I. Frank, St. Louis, for Bridlespur Hunt Club & St. Paul Merc. Ind. Co.

ANDERSON, Judge.

This is a proceeding under the Workmen's Compensation Law (Sections 287.010–287.800 RSMo 1949, V.A.M.S.). Claimant-appellant is John H. Lawrence. The respondents are William Gebhardt, Jr., & Son and Bridlespur Hunt Club, alleged employers, together with their respective compensation insurers. Claimant was injured while working on the premises of Bridlespur Hunt Club. The referee of the commission found: (1) that claimant's injury did not arise out of and in the course of his employment with William Gebhardt, Jr., & Son; and (2) that claimant was not an employee of Bridlepsur Hunt Club when injured. The referee denied compensation. In due course, claimant filed his application for review by the full commission. The commission found: (1) that the firm of William Gebhardt, Jr., & Son was not an independent contractor; (2) that William Gebhardt, Jr., was an employee of Bridlespur Hunt Club with authority to employ others for Bridlespur, one of whom was claimant; (3) that claimant was therefore an employee of Bridlespur; and (4) that claimant was performing work for Bridlespur when injured and was entitled to compensation from Bridlespur. The award was for twenty per cent (20%) permanent partial disability to the body as a whole. Thereafter, an appeal was taken to the circuit court by Bridlespur. The circuit court affirmed the finding in favor of William Gebhardt, Jr., & Son, and reversed the award in favor of claimant and against Bridlespur. From this judgment, claimant has appealed to this court.

The record shows that William Gebhardt, Jr., & Son, a partnership, were engaged in business as contractors and builders. Claimant, John H. Lawrence, was a laborer employed by the partnership to work for it on various jobs. Claimant was first employed by Gebhardt on July 5, 1955. Bridlespur Hunt Club was the owner of a tract of farm land located in St. Charles County and desired to transform it into a social and hunt club. During the summer of 1955 the partnership, acting through William Gebhardt, Jr., entered into an oral agreement with Bridlespur to do certain construction and remodeling on these premises. In the negotiations which resulted in this agreement Bridlespur was represented by Andrew Shinkle, president of the club, and Dr. Bickel, its treasurer. The work contemplated by this agreement consisted of repairing an old barn and converting it into a dog kennel, the construction of a new barn, and the repairing of a house. Later, the parties agreed that the repairing of the house should be done by others. Bridlespur agreed to pay the Gebhardts for their work on the basis of labor and material costs, plus ten per cent—payments to be made once a month.

The plan for transforming the premises into a hunt club also called for the erection of a kennel fence. Gebhardt would not undertake this work for the reason that he was not familiar with that kind of construction. Henry Rohde, huntsman for Bridlespur, was then put in charge of this work. Rohde asked claimant if he knew of anyone he could hire for this work, which involved tearing down the kennel fence at the club's premises on Olive Street Road in St. Louis County and erecting it

on the St. Charles property. Claimant gave Rohde the names of several men. These men were then hired by Rohde. They were: Mr. Bridgeport, Fred Hawkins, James Booth, and William Booth. Rohde also employed Raymond Schwede, whom he had known for many years and who had worked for him previously. It seems that Schwede and William Booth did most of the work in erecting this fence. Rohde would come onto the premises approximately each morning, or at other times during the day, to supervise the job and give directions to Schwede and Booth. Rohde testified: "Q. And you were definitely in charge of their physical activities on this job? A. As far as telling them what to do and how to put up the fence, yes. Q. Did Mr. Gebhardt at any time to your knowledge give any instructions or orders to these men about how to put up the kennels and what process to go through and what methods to use in putting up this fence? A. Not to my knowledge, it was my job to tell them what to do * * * when the subject was first brought up about the building out there, I asked him (Gebhardt) whether he could take over that job too, and he said he didn't think he could do it and I knew more about it and just how I wanted it put up and he said I'll let you take that end of it."

Rohde received no pay for his services from Gebhardt but was paid by Bridlespur. It was agreed between Rohde and Gebhardt that the latter each week would pay the men who worked on the fence and then bill Bridlespur for the amounts so paid, plus ten per cent. It was also Gebhardt's duty to handle the payroll deductions for social security and withholding tax, which amounts were included in his bill to Bridlespur. The reason for the arrangement was to relieve Bridlespur of the inconvenience of keeping books. On this point, Gebhardt testified: "I was to pay them because Bridlespur didn't want to fool around with books on them, they figured it would be only three or four weeks. * * * Q. But you were merely acting as paying agent for

Bridlespur? A. That's right. * * * They were charged ten per cent for handling charges. I had to drive seven or eight miles when they were down at the old club, which didn't hardly cover it * * *." Bills for these charges were submitted separately from those for the work done on the barns. Rohde kept a record of the time these men worked and gave it to Gebhardt each week.

Mr. Gebhardt testified that neither Mr. Rohde nor any other person connected with Bridlespur ever gave orders to his employees as to the manner in which they were to do their work. Henry Rohde testified that he never gave claimant any instructions as to how claimant should perform his work, although he might have "told him to pick up a board or something like that." When asked whether he had ever discussed with Gebhardt how the work on the barns should be done, Rohde replied: "We might have talked about it, but I had nothing to do as far as the building was concerned." The witness further testified that Dr. Bickel and Mr. Shinkle were on the premises several times and gave directions to Mr. Gebhardt. What these directions were was not disclosed by the witness. He stated he heard discussions between Gebhardt, Bickel and Shinkle when they first started talking about remodeling the kennels and putting up the new barn. Rohde testified: "They were talking how to put up the kennel and barn * * * they changed their minds about a few things and decided to do it a different way." It is apparent that these directions and discussions were had before the work started and related to the ultimate result to be accomplished. This is made clear by the following testimony: "Q. Did you ever hear Dr. Bickel or Andrew Shinkle give any directions to John Lawrence or any other workmen? A. Dr. Bickel and Mr. Shinkle had nothing to do as far as Lawrence, that was Gebhardt's job."

The commission based its ruling—that William Gebhardt, Jr., & Son were not independent contractors—upon certain testi·

mony given by Gebhardt on cross-examination. At that time, he was being questioned about the agreement with reference to his payment of the wages of the men working on the fence. There then appears the following:

"Q. * * * And they were to be billed through your books? A. If you want to go into it that way, then I was only a go-between on the whole job. * * * I would only have been a go-between if you want to go into that question. In other words, they was bossing me, but you pay the bills and we'll reimburse you, if you want to go into that detail.

"Q. You say they were bossing you, who? A. I didn't have a contract, there was no contract, I got orders from Bickel and Shinkle.

"Q. Did they tell you what to do first and second? A. Oh, yes.

"Q. They told you when to tear down the barn? A. That's right.

"Q. And build the other? A. That's right.

"Q. And one day you would arrive on the premises and they would tell you they wanted you to work at certain places, is that right? A. That's right.

"Q. Would they meet you every day and give you directions? A. Oh, no, at last it got so it was two weeks apart, but there were times we would get started, for instance, we was ready to start digging the footing for the barn and they come out and said, 'hold everything, don't start the barn.'

"Q. At any time did you see them give directions or orders to your men? A. Oh, no. I don't think they knew what men was what, what they do, or anything.

"Q. It was a rather loose arrangement, it was under Bridlespur's main control as to what work was done at one time? * * * A. Well, I wouldn't say that.

"Q. Well, it was under their control? A. Yes, under their control, I wouldn't say that was a loose arrangement, because on the job when you don't have a contract and anybody who knows anything about the building industry knows it just works altogether different.

" * * * * * *

"Q. When you say they gave you instructions as to what to do and where to work, did they specify the jobs you were to start on, in other words, please start on this job at this time—is that what you mean? A. That's right. We had to start the kennels first before we could start the barn.

"Q. They did tell you the order that they wanted the work done? A. That's right.

"Q. But when you were doing the work they didn't come in to tell you how to do it or your men—I mean your part of it? A. No."

Claimant testified that Mr. Gebhardt, Jr., hired him, paid him, and gave him directions as to what to do. When asked if he ever received instructions from Mr. Rohde, claimant replied: "Well, just like I said, a small thing, maybe he might ask me to help carry a board." When asked if there were any others, he replied: "Just like you was working with somebody, or Bill, he asked me to help him, like lift something, and I asked him to help me if there would be something to lift. * * * The job wasn't that strict that we couldn't help each other around there as I know of, they didn't say anything to me about it before the accident."

Claimant started to work at the Bridlespur premises about two weeks prior to the day he was injured. Previously thereto, he had worked for Gebhardt on another job.

Gebhardt testified that he told Rohde that the latter could have any of his men to

work on the fence except claimant. This was in the presence of claimant, who smiled when the remark was made. Claimant admitted hearing this conversation. This occurred about two weeks prior to the date of the accident.

Mr. Gebhardt testified that there was a definite understanding as to who was to have supervision and control over the men working on the Bridlespur premises; that Mr. Rohde was to take care of the fence and the tearing down of the old kennel on Olive Street Road, and that he (Gebhardt) did not at any time give any orders or instructions of any character to the men who worked on the fence with reference to the means and manner in which they were to do said work. He stated: "All I done was to go over there while they were working there on Friday and give them their checks. I didn't care what they done, I wasn't their foreman." He testified that Rohde was "their foreman for Bridlespur." The men under Rohde's control were William Booth, Raymond Schwede, and two others whose names Gebhardt could not recall.

Raymond Schwede testified that he was hired by Rohde; that Rohde laid out the work for him each day; and that he received no orders with reference to the manner of doing the work from anyone other than Rohde. He testified he had no authority to direct claimant to help him in his work. Like testimony was given by Rohde.

On October 4, 1955, Gebhardt arrived at the job site about the usual time. He had with him some paint to give to claimant, who had been instructed to paint one of the barns. Claimant was not there when Gebhardt arrived. Gebhardt waited a few minutes, then concluded that since it had rained that morning claimant would not report for work. Gebhardt then left the premises, taking the paint with him, and went to another job site about seven miles away. Thereafter, claimant arrived and started painting the barn. He soon ran out of paint. He then started picking up boards and pieces of lumber which had fallen from the side of the barn and stacked them. He completed this job about 10:00 o'clock. Mr. Gebhardt had not then returned. Claimant then walked over to where Schwede and Booth were working on the fence. Claimant testified: "that white fellow asked me to come over and help them. * * * I ran out of paint and Gebhardt hadn't brought me any paint over and he asked me to help on the fence until Gebhardt probably come over there with some paint." The "white fellow" referred to was Schwede.

Schwede testified: "We was all three of us talking, we said we could use help * * * well, we went to work, started unrolling the wire, Lawrence came and helped. Q. Did you ask him to help you? A. I just don't remember—we was standing talking and he didn't know what to do and I said we could use help. * * * He never helped us before."

Booth testified on direct examination that Schwede had asked claimant to help with the wire. On cross-examination, on being shown his written signed statement, which stated that claimant had offered to give them a hand, Booth finally admitted that such was the fact.

While assisting in unrolling some wire claimant slipped and fell, sustaining a back injury. Neither the fact of injury nor the extent thereof is controverted on this appeal.

That portion of the commission's finding relevant to the issues on this appeal is as follows:

> "We find from all the evidence that William Gebhardt, Jr., was employed by the Bridlespur Hunt Club as a carpenter to remodel an old barn, build a new barn and do other building construction work on the premises of the Bridlespur Hunt Club in St. Louis County, Missouri; and that the Bridlespur Hunt Club controlled and had the

right to control the work of William Gebhardt, Jr., and men selected and employed by him to assist him in such work. We, therefore, find and conclude that William Gebhardt, Jr., was an employee and an agent with authority to select and employ others for Bridlespur Hunt Club, and that William Gebhardt, Jr., and Son was not an independent contractor. We further find and conclude that John H. Lawrence, on October 4, 1955, was an employee of Bridlespur Hunt Club as one of the men selected and employed by William Gebhardt, Jr., and working with him on the construction project of the employer, Bridlespur Hunt Club.

" *     *     *     *     *     *

"We further find from all the evidence that on October 4, 1955, and at the time of the accident hereinafter found by us that John H. Lawrence was performing work for the Bridlespur Hunt Club, and that the work he was performing was covered by the Workmen's Compensation Act of Missouri."

Appellant assigns as error the trial court's action in reversing the award of the Industrial Commission. In support of this contention it is urged that an examination of the whole record reveals competent and substantial evidence to support said award. Respondent Bridlespur's position is: (1) that the evidence conclusively shows that claimant was an employee of William Gebhardt, Jr., & Son, independent contractors; (2) that the accident did not arise out of and in the course of employment; and (3) that claimant was not a statutory employee of Bridlespur under the provisions of Section 287.040 RSMo 1949, V.A.M.S.

Definitions of "master", "servant", and "independent contractor", made by the American Law Institute's Restatement of the Law of Agency, Chapter 1, § 2, have been adopted by our Supreme Court in a number of cases. Skidmore v. Haggard, 341 Mo. 837, 110 S.W.2d 726; Barnes v. Real Silk Hosiery Mills, 341 Mo. 563, 108 S.W.2d 58; Mattan v. Hoover Co., 350 Mo. 506, 166 S.W.2d 557. Said definitions are as follows:

"(1) A master is a principal who employs another to perform service in his affairs and who controls or has the right to control the physical conduct of the other in the performance of the service.

"(2) A servant is a person employed by a master to perform service in his affairs whose physical conduct in the performance of the service is controlled or is subject to the right of control by the master.

"(3) An independent contractor is a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking." A.L.I., Agency, Ch. 1, § 2.

In determining whether one performing services for another is an employee or an independent contractor, numerous matters of fact are to be considered: the extent of control which, by the agreement, the alleged employer may exercise over the details of the work; the actual exercise of control; whether the person performing the service is engaged in a distinct and independent calling, requiring the skill of one specially trained; whether the work is usually done under the direction of an employer, or by a specialist without supervision; the length of time for which the person is hired; the right to discharge the worker at any time prior to the completion of the work; the method of payment, whether by the time or by the job, without reference to the time consumed in performing the service; whether the alleged employer or the workman supplies the necessary tools, machinery and appliances; whether or not the work is a part of the

regular business of the alleged employer; whether the employer has the right to hire, discharge and determine the pay of others who assist the worker in the performance of the work; and whether the alleged employer directs the details of the work performed by those assisting said worker. Nabors v. United Realty Co., Mo.App., 298 S.W.2d 474; Maltz v. Jackoway-Katz Cap Co., 336 Mo. 1000, 82 S.W.2d 909; Miller v. St. Louis Realty & Securities Co., Mo. App., 103 S.W.2d 510; 1 Larson, Workmen's Compensation Law, § 43.10, p. 624; Mattan v. Hoover Co., 350 Mo. 506, 166 S.W.2d 557; Barnes v. Real Silk Hosiery Mills, 341 Mo. 563, 108 S.W.2d 58.

No one of the foregoing factors is in itself controlling, but each may be considered as relevant to the issue. Mattan v. Hoover, supra; Bass v. Kansas City Journal Post Co., 347 Mo. 681, 148 S.W.2d 548.

■ The question here involved is: Who was claimant's employer? This depends upon whether Gebhardt was an independent contractor or a mere employee of Bridlespur. If Gebhardt was an independent contractor, then claimant was an employee of Gebhardt and not an employee of Bridlespur. If Gebhardt was an employee of Bridlespur, with authority to hire other employees for Bridlespur, as contended by appellant, then claimant was Bridlespur's employee and his injury compensable.

We have, with the aid of the foregoing principles, examined the evidence and have reached the conclusion that Gebhardt was an independent contractor and not an employee of Bridlespur.

The record shows that Gebhardt was engaged in business as a contractor and builder. Such work is usually done by independent contractors, and is a distinct calling requiring the skill of one specially trained. Gebhardt was not paid on the basis of the time spent in the performance of the work, but on a cost plus 10% basis. He came and went as he pleased. He had another job going at another location where he spent about fifteen per cent of his time. There was no evidence that Bridlespur reserved the right to end Gebhardt's services short of the completion of the construction. Gebhardt hired the men who worked under him, and paid their wages. He directed them as to the method and manner of doing the work. No one connected with Bridlespur ever assumed any authority over these men or gave them orders with reference to the details of their work. It was not shown that Bridlespur had the right to discharge any of these workmen, or ever attempted to exercise such right. Gebhardt supplied his own tools. He carried his own compensation insurance.

The commission found that Bridlespur controlled and had the right to control the work of William Gebhardt, Jr. It based its ruling on certain testimony given by Gebhardt on cross-examination, which testimony we have heretofore set out in full. It is clear from a reading of this testimony that when Gebhardt stated that Bickel and Shinkle were "bossing" him, and that the arrangement for this work was under Bridlespur's control, Gebhardt was merely expressing an opinion based, partly at least, upon a misconception of the legal effect of his failure to have a written contract. The only fact testified to was that Bickel and Shinkle would occasionally direct him as to the order in which they wanted the work done. This testimony of itself is not a sufficient basis for a finding that Bridlespur retained the right to control Gebhardt with respect to his physical conduct in the performance of the undertaking. In our judgment, such a finding is against the overwhelming weight of the evidence.

Under the evidence as we view it, liability cannot be imposed on Bridlespur upon the theory advanced by appellant, namely that claimant was an employee of Bridlespur and that his injury arose out of and in the course of such employment.

Appellant nevertheless argues that if he cannot recover as a regular employee, he is entitled to compensation as a "statutory" employee under Section 287.040 RSMo 1949, V.A.M.S. There is no merit to this contention.

■ Claimant cannot qualify as a statutory employee under paragraph 1 of said § 287.040, supra, for the reason that the work Gebhardt was engaged in at the time was not a part of the usual business which Bridlespur conducted on the premises. But even if the work was a part of Bridlespur's usual business, claimant would not be entitled to recover. Paragraph 3 of said section provides that the provisions of the section shall not apply to the owner of premises upon which improvements are being erected, demolished, or repaired, but that such contractor shall be deemed the employer of the employees of his subcontractors and their subcontractors when employed on or about the premises, etc.

In the case of Bobbitt v. Ehlers, Mo.App., 131 S.W.2d 900, this court held that Section 3308(c), R.S.Mo. 1939—now § 287.040(3)— applied to owners erecting a building on their premises through an independent contractor, and not Section 3308(a)—now § 287.040(1), notwithstanding that the work may have been part of the usual business of the owners.

The commission also found that John H. Lawrence was performing work for the Bridlespur Hunt Club and was, therefore, covered by the Workmen's Compensation Act.

■ To be covered by the Act, the relation of employer and employee must be established. Section 287.020 RSMo 1949, V.A.M.S., provides: "The word 'employee' as used in this chapter shall be construed to mean every person in the service of any employer, as defined in this chapter, under any contract of hire, express or implied, oral or written, or under any appointment or election." Clearly, claimant was not an employee under this definition, but was a mere volunteer.

In his points relied on, complaint is made that the court erred in not granting claimant a hearing at which he could adduce testimony concerning his permanent disability and need for future medical aid, etc. At the hearing, this assignment was withdrawn; therefore it will not be necessary for us to give further consideration to this point.

Appellant makes no complaint with reference to the judgment in favor of Gebhardt and his insurance carrier. Therefore, an affirmance of the judgment as to said respondents is necessary under the well settled rules of appellate practice. And it follows, from what we have said, that the judgment should also be affirmed as to Bridlespur Hunt Club and its insurance carrier.

The judgment appealed from is affirmed.

RUDDY, P. J., concurs.

MATTHES, J., not sitting.